EDDIE CANTOR AND BENJAMIN F. HOLZMAN,

*vs.*

ARTHUR SACHS, WALTER E. SACHS, HOWARD J. SACHS, SAMUEL SACHS, HARRY SACHS, WADDILL CATCHINGS, SIDNEY J. WEINBERG, HENRY S. BOWERS, GRANT KEEHN, ERNEST W. LOVEMAN, SAMUEL W. ANDERSON, individually and as present or past co-partners doing business under the firm name and style of Goldman Sachs & Co., and RALPH JONAS, FRANK L. TAYLOR, HARRY J. BAUER, NION R. TUCKER and HAMILTON V. BAIL, GOLDMAN SACHS TRADING CORPORATION, HARRISON WILLIAMS and CENTRAL STATES ELECTRIC CORPORATION.

*New Castle, June 14, 1932.*

362

*Clarence A. Southerland,* of the firm of Ward & Gray, and *David L. Podell,* of New York City, for complainants.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Edward H. Green,* of the firm of Sullivan & Cromwell, of New York City, for defendants appearing specially.

THE CHANCELLOR,: The statute under which the order of seizure was entered is found in its present amended form in 36 *Del. Laws, Ch.* 268. It is known as *paragraph* 3850, § 7, of the *Revised Code* 1915. It is as follows:

"3850, Sec. 7. *Orders for Appearance; Upon Failure of Service and Affidavit; Publication of; Upon Default; Decree Pro Confesso; Enforcement by Seizure or Delivery of Property Demanded; Payment Upon Security for Restitution; Proceedings if Security Not Given; Foreign Attachment:*—If, after subpoena or other process issued, any defendant therein named shall not appear in obedience to said process and according to the rules of the Court, the Court may, on affidavit that such defendant is out of the State, or cannot be found to be

served with process and that there is just ground to believe that he intentionally avoids such service, make an order for his appearance on a certain day and publish such order as the Chancellor shall direct not less than once a week for three consecutive weeks. And if the defendant shall not appear, after such publication, according to such order, the Court may order the plaintiff's bill to be taken *pro confesso*, and may thereupon issue process to compel the performance either by seizure of the real and personal property of such defendant or part thereof, sufficient to satisfy the plaintiff's demand, or by causing possession of the estate, or effects, demanded by the bill, to be delivered to the plaintiff, or otherwise, as the case requires. And the Court may also order the plaintiff to be paid his demand out of any property so seized, upon his giving approved security, in a sufficient sum, to abide any order of the Court for the restitution thereof upon the defendant's appearing to defend the suit, and paying such costs as the Court shall order. If such security be not given, the property seized, or whereof possession shall be decreed to be delivered, shall remain under the direction of the Court in the hands of a receiver or otherwise, until the defendant's appearance, or until such order shall be made therein as the Court shall think just.

"If it shall appear in the bill of complaint that the defendant or any one or more of the defendants is a non-resident of the State of Delaware, it shall be lawful for the Chancellor to make an order directing such non-resident defendant or defendants to appear by a day certain to be designated. Such order shall be served on such non-resident defendant or defendants by mail or otherwise, if practicable, and shall be published in such manner as the Chancellor may direct, not less than once a week for three consecutive weeks. The Chancellor shall have power to compel the appearance of the defendant by the seizure of all or any part of his property, which property may be sold under the order of the Chancellor to pay the demand of the complainant, if the defendant shall not appear, or shall otherwise default. Such property shall remain subject to said seizure and may be sold to satisfy any decree made in the cause, unless security sufficient to the Chancellor shall be given to secure the release thereof. The Chancellor shall have power to make all necessary rules respecting the form of process, the manner of issuance and return thereof, the release of such property from seizure and for the sale of the property so seized, and may require the plaintiff to give approved security to abide any order of the Chancellor respecting the said property. Any transfer or assignment of the property so seized as aforesaid after the seizure thereof shall be void and after the sale of said property is made and confirmed, the purchaser shall be entitled to and have all the right, title and interest of the defendant in and to the property so seized and sold and such sale and confirmation shall transfer to

the said purchaser all the right, title and interest of the defendant in and to said property as fully as if the defendant had transferred the same to the purchaser in accordance with Law."

The second paragraph of the *Section* is the one upon which the complainants rely as justifying the order in question.

The order is attacked on several grounds. One of these is that the paragraph of the statute which is relied upon in support of the order is unconstitutional in that it is violative of the due process clause of the *Fourteenth Amendment* to the *Constitution of the United States* and of the *Bill of Rights* of the *Constitution of the State of Delaware* (*Article* 1, § 9).

While the power of courts is undoubted and their duty imperative in a clear case to declare an act of the Legislature void for its infringement of constitutional provisions, yet the rule is well nigh universal that courts will refuse to exercise the power or even to consider whether the case is one that invokes the performance of the duty, unless a decision can be reached on no other ground than the constitutional one. This proposition is so well settled I deem it unnecessary to cite the authorities establishing it. They may be found collected in the notes to 12 *C. J.* 780, § 212, and 6 *R. C. L.* 77, § 75. There is no occasion at this late day to elaborate upon the reasons which underlie the rule.

In the instant case, therefore, if there be any ground of decision other than the constitutional one upon which a determination of the issue may be rested, the court should decline to enter upon a consideration of the constitutional question. This course was pursued in *Wightman v. San Francisco Bay Toll-Bridge Co.,* 16 *Del. Ch.* 200, 142 *A.* 783.

The paragraph of the statute in question undertakes to provide for equity a procedure analogous to that of foreign attachment at law. The law courts in construing the foreign attachment statute have adopted the rule of strict construction. *Vogle v. New Granada, etc., Co.,* 1 *Houst.* 294; *Smith v. Armour,* 1 *Pennewill,* 361, 40 *A.* 720; *Fowler v.*

*Dickson,* 1 *Boyce,* 113, 74 *A.* 601. Aside from the statute, equity as administered in this State knows of no procedure such as foreign attachment. *Cities Service Co. v. McDowell, et al.,* 13 *Del. Ch.* 109, 116 *A.* 4; *Skinner v. Educational Pictures, etc., Co.,* 14 *Del. Ch.* 417, 129 *A.* 857. If a complainant seeks to avail himself of the benefits of the statute providing in substance for attachment *in limine* of the defendant's property to be held to abide and satisfy the final decree, he must bring his case within the plain purview of its terms. The case of *Wightman v. San Francisco Bay Toll-Bridge Co., supra,* was decided in harmony with this view.

If then the case of the complainants does not fall clearly within the scope of the statute the seizure which has been made must be vacated. It is now in order to examine the question raised, among others, by the defendants of whether the sort of case which the bill presents is one to which the provisions of the statute are applicable.

The complainants' case, being asserted by them in their derivative right as stockholders, has a double aspect. Its nature is dual. *Hawes v. Oakland,* 104 *U. S.* 450, 26 *L. Ed.* 827; *Fletcher; Cyclopedia of Corporations,* § 4061. It asserts as the principal cause of action a claim belonging to the corporation to have an accounting from the defendants and a decree against them for payment to the corporation of the sum found due on such accounting. In this aspect, the cause of action is the corporation's. It does not belong to the complainants. Inasmuch however as the corporation will not sue because of the domination over it by the alleged wrongdoers who are its directors, the complainants as stockholders have a right in equity to compel the assertion of the corporation's rights to redress. This is their individual right. A bill filed by stockholders in their derivative right therefore has two phases—one is the equivalent of a suit to compel the corporation to sue, and the other is the suit by the corporation, asserted by the stockholders in its behalf, against those liable to it. The former belongs to the

complaining stockholders; the latter to the corporation. The complaining stockholders are allowed in derivative bills to bring forward these two causes of action in one suit. But any recovery granted by the decree necessarily is in favor of the corporation. The complaining stockholders secure nothing to themselves as individuals, beyond the mere right, which is inherent in the decree for relief to the corporation, of compelling their recalcitrant corporation to accept the relief which the decree affords.

The foregoing brief analysis of the nature of the suit is made as a background for an examination of the question which the defendants raise of whether the second paragraph of *Section* 3850 of the *Code* as amended, upon which the complainants rely, is applicable to the case.

Is then the statute applicable? The argument is made that the language of the statute indicates that its provisions are available only in favor of those complainants who sue to secure redress belonging to them in their individual right; and, if so, the present complainants are not entitled to go on with the suit against the defendants for the reason that the bill in that one of its aspects which concerns the individual rights of the complainants presents no case calling for relief against the individual defendants, the relief prayed against them being such only as is in favor of their co-defendant, the corporation.

This argument is based on the language of the statute which says that the seized property may be sold to satisfy the "demand of the complainant." Since the complainants assert no demand of their own capable of satisfaction by sale, it is argued that the statute is therefore not applicable to such a case as the bill presents. *Wightman v. San Francisco Bay Toll-Bridge Co.*, *supra*. If it be suggested that "complainant" as used by the statute does not mean the formal complainant as shown by the arranging of the parties on the record, but may mean the equitable complainant, the corporation in this case, who is found on the defense side of the suit, and that therefore the suit is maintainable

under the statute, the reply is made that this cannot be so, that "complainant" means only formal complainant appears by reason of the fact that when the word "plaintiff" subsequently appears it is manifest that formal plaintiff is meant, and that consistency of definition requires "complainant" to be given a like formal meaning.

This argument would be more persuasive if it did not overlook another clause in the statute which provides that the seized property "may be sold to satisfy any decree in the cause." A decree in whose favor? The quoted clause does not indicate. It is general in its terms. "Any decree," is its language. How is it possible to say that the decree referred to can be only such decree as runs in favor of the formal complainant? This question is the more difficult to answer when it is remembered that the case which provoked the enactment of the statute in its original form (35 *Del. Laws, Ch.* 217) and in which original form the quoted language appears, was a case of a derivative suit in which the decree if entered would have been in favor not of the formal complainant but of a corporation defendant. For the origin of the statute see *Wightman v. San Francisco Bay Toll-Bridge Co.,* 16 *Del. Ch.* 200, 142 *A.* 783.

I am of the opinion that the seized property might be sold to satisfy any decree that might be obtained affording relief to the corporation notwithstanding it stands of record as a technical defendant.

Another objection urged by the defendants which involves no constitutional question is, that the statute provides that the "Chancellor shall have power to make all necessary rules respecting the form of process, the manner of issuance and return thereof, the release of such property from seizure and for the sale of the property so seized," etc.; that no such rules have been made; and that therefore the statute is inoperative.

The statute in this sentence does not purport to require the promulgation of rules as a condition of its operation. Its language is not mandatory. It is permissive. The

rules the Chancellor may make are such as may be necessary. Now because the Chancellor has as yet not found it necessary to adopt rules, but has thus far deemed existing rules and processes adequate for the purpose of the statute, or, if we care to make the assumption, because he has been neglectful of attention to the subject of special rules to cover the cases contemplated by the statute, it is argued that the legislative act is in a state of suspended operation. I do not think the failure of the Chancellor to exercise the permissive power of making rules conferred on him by the statute can have the effect of suspending the statute's operation. The defendants cite numerous authorities in support of their contention under this head. Among them is *Stoeckle v. Armstrong*, 8 *Del. Ch.* 150, 38 *A.* 1059, 1062, which quotes with approval the language of Chancellor Kent in *Newburgh & Cochecton Turnpike Road Co. v. Miller*, 5 *Johns. Ch.* (*N. Y.*) 101, 9 *Am. Dec.* 274, as follows:

"In respect to statutes, the rule of construction seems to be that the word 'may' means 'must' or 'shall' only in cases   *   *   *   where the public or third person have a claim *de jure* that the power should be exercised."

Other authorities cited by the defendants are to the same effect. The rule as stated may be conceded. A permissive power conferred on a court to formulate such rules as may be necessary to govern the administering of a statutory remedy is not however a power in the exercise of which the public or third parties have a *de jure* claim that the court should exert itself. I shall not burden this opinion with a review of the cases cited by the defendants in order to show that in none of them has the rule been applied to such a power as the one here involved, nor to any other power analogously related thereto in principle.

There being no merit in the foregoing reasons advanced in support of the motion to vacate the order of seizure, it becomes necessary finally to consider the contention that the motion should be granted because the statute under which the order was entered is unconstitutional in

that it violates the due process clause of the *Fourteenth Amendment of the Constitution of the United States* and the analogous provision found in the *Bill of Rights* of the *Constitution of Delaware*. The statute is said to be unconstitutional for any one of three reasons. These will now be dealt with in the order of their statement on the brief of the defendants.

First. It is urged, the statute is invalid because its scheme contemplates notice to the defendants before there has been any seizure of the defendants' property.

Where as here an action which in point of form is one *in personam*, is instituted against a person over whom the court has never obtained personal jurisdiction, it is conceded that it cannot proceed to judgment unless property has been found within the jurisdiction belonging to the defendant and has been seized by the court by lawfully authorized process. *Pennoyer v. Neff*, 95 *U. S.* 714, 24 *L. Ed.* 565. If such seizure be accomplished, the action then is turned into an action in the nature of a proceeding *in rem*. The judgment finally entered, though in form a personal one, is nevertheless effective, in the absence of the appearance of the defendant, only to the extent that the seized property is capable of satisfying it. *Lutz v. Roberts Cotton Oil Co.*, 3 *Boyce*, 227, 82 *A.* 601. The jurisdiction of the court in such case is based solely on the presence of the property within the reach of its process. But the presence of the property within the court's jurisdiction is not enough, in and of itself, to subject the owner to the power of the court to reach it by a personal judgment against him. *Pennoyer v. Neff, supra,* plainly settles that proposition. The court must, before its limited jurisdiction can be maintained against the person of the owner, seize the property and afford the defendant an opportunity to be heard before judgment is entered. Notice to him in some form is essential.

The seizure, argue the defendants in this cause, is the thing which breathes life into the limited jurisdiction over

the person, *qua* owner; until that is had, the court is pow-
erless to make and direct notice of any sort of order upon
the defendant. And so, it is argued, when a statute directs
notice to be given to an absent defendant to appear and
defend himself before any seizure of his property has been
effected, it assumes to authorize a court to take a step, viz.,
the issuance of an order upon the defendant, before its
jurisdiction has sprung into life. Language is excerpted
by the defendants from the discussions found in some of
the opinions of the United States Supreme Court to estab-
lish the proposition that the court in such cases as we are
here dealing with is powerless to act unless there has been
a seizure of the defendants' property at the very commence-
ment of the suit. If so, it is argued, notice directed by a
court to a defendant beyond its jurisdiction and before any
property of his has been seized, is no notice and a statute
which undertakes to fasten upon a defendant the binding
consequences of such a notice is invalid. It can, goes the
argument, neither bind him personally because of his non-
residence, nor as the owner of property because his prop-
erty has not yet been seized.

I have examined the cases referred to by the defend-
ants in support of this contention. While there may be
some implications in their language to the effect contended
for, yet the nature of the cases in which it was used called
for no decision upon the point. The language was em-
ployed only in the course of discussion, and, because of the
facts involved, was quite consistent with the conception
that it was meant to refer only to the necessity of seizure
and an opportunity to be heard before final judgment.

"Jurisdiction," said the Supreme Court of the United States in
*Cooper v. Reynolds*, 10 *Wall.* 308, 316, 19 *L. Ed.* 931, "has reference
to the power of the court over the parties, over the subject-matter,
over the *res* or property in contest, and to the authority of the
court to render the judgment or decree which it assumes to make. By
jurisdiction over the subject-matter is meant the nature of the cause
of action and of the relief sought. * * * Jurisdiction of the
person is obtained by the service of process, or by the voluntary

appearance of the party in the progress of the cause. Jurisdiction of the *res* is obtained by a seizure under process of the court, whereby it is held to abide such order as the court may make concerning it. The power to render the decree or judgment * * * depends upon the nature and extent of the authority vested in it [the court] by law in regard to the subject-matter of the cause."

In this case we are not concerned with the question of jurisdiction of the subject matter, nor with the question of the power of the court under the law to render a decree in regard to the subject matter. Our sole question under the present head relates to jurisdiction over the *res*, and, to the extent of its value, over the persons of the owners. Particularly the question is—must the court assert its jurisdiction over the *res* by seizure thereof before it has any authority to address any order to its owner to appear and defend?

Having jurisdiction over the subject matter is sufficient in itself to authorize the court to take whatever steps are necessary to effectuate its ultimate assertion of jurisdiction in the form of a decree for final relief. It is this phase of the court's jurisdiction which warrants the order of seizure. If it were not so, the order of seizure could never issue. When it issues and the defendant's property has been seized thereunder, an effective step is taken towards bringing the defendant into court. Now if we assume, as for the moment we are assuming, that the seizure of an absent defendant's property is not enough in and of itself to bring him into court as owner, but that the seizure must be supplemented by notice to him, it is admitted that notice after the seizure is sufficient to satisfy all jurisdictional requirements. Notice before seizure, it is argued however, is not sufficient in this regard. Why not? I can discover no reasonable basis for saying that the jurisdiction over the subject matter is ample to support an order designed to subject the *res* to the jurisdiction, but is totally incapable of supporting an order of notice designed to subject the defendant as owner of the *res* to the jurisdiction, provided of course the *res* is ultimately seized and the no-

tice to the owner is such as is reasonably calculated to afford him the opportunity to be heard. As between seizure of the *res* on the one hand and notice to the owner on the other, which shall precede the other seems to be merely a question of regulation or method, so long as notice to the owner and an opportunity to be heard are secured. It is a mere matter of procedural sequence. All those cases which I have seen dealing directly with the question, so hold. *Hartzell v. Vigen*, 6 *N. D.* 117, 69 *N. W.* 203, 35 *L. R. A.* 451, 66 *Am. St. Rep.* 589; *State ex rel. Bank v. Circuit Court*, 32 *S. D.* 573, 143 *N. W.* 892; *Iowa State Savings Bank v. Jacobson*, 8 *S. D.* 292, 66 *N. W.* 453; *Porter v. Duke*, 34 *Ariz.* 217, 270 *P.* 625; *Tufts v. Volkening*, 122 *Mo.* 631, 27 *S. W.* 522. Those cases, examples of which may be found in the New York reports, which deal with whether or not particular statutory provisions are so framed as to require that seizure shall antedate notice by publication are of course cases of construction and are not pertinent in the present connection.

In the instant case some discussion has been had as to whether or not our statute requires the seizure to precede the publication. The defendants insist that it does not, that at the most it contemplates a simultaneous order of seizure and publication, and that accordingly the statutory notice to the defendant is directed by the statute to issue before there has been a seizure. I have assumed, without deciding, this to be so, and for the reasons above stated have reached the conclusion that, even if the statute be so construed, it is not invalid. If the defendants were moving to vacate the order, not on constitutional grounds but because the procedural sequence provided by the statute has not been followed, then it would be necessary to enter upon a consideration of the statute's construction with respect to the assumed point.

Second. We come now to the next question raised by the defendants, viz., is the statute invalid because the no-

tice required by the statute is insufficient to give reasonable notice to them?

Since *Wuchter v. Pizzutti*, 276 *U. S.* 24, 48 *S. Ct.* 259, 72 *L. Ed.* 446, 57 *A. L. R.* 1230, no argument is needed to show that whenever notice of proceedings under a statute is required by due process of law to be given to a defendant, the statute itself must direct it. It will not satisfy the requirements if notice be actually given, if it be gratuitous. Notice cannot depend upon the favor of the court. *Coe v. Armour Fertilizer Works*, 237 *U. S.* 413, 35 *S. Ct.* 625, 59 *L. Ed.* 1027. And so in the instant case, the fact that the defendants did actually receive notice of the court's order to appear on a day designated, can be of no importance if the statute does not direct notice.

The statute does, however, direct notice to the defendant in unmistakable terms. It provides that an order shall issue directed to the defendant to appear by a day certain to be designated in the order. It further provides that this order shall be served on the defendants by mail or otherwise if practicable, and shall be published in such manner as the Chancellor shall direct, not less than once a week for three consecutive weeks. It then proceeds to provide that the appearance of the defendant may be compelled by a seizure of his property. The notice by publication is mandatory, that by mail, or otherwise if practical, is mandatory and whatever notice is conveyed by seizure of the defendants' property is self-operating. Of course if the suit is *in personam* and the defendants are beyond the jurisdiction and do not appear, the seizure is essential if the cause is to proceed. Publication and notice by mail in cases of personal suits against non-residents would be useless gestures in the absence of a seizure of property belonging to the defendant. The duty is laid upon the court to follow the provisions of the statute as to service of its order to appear. The statute in this regard is entirely unlike that found in New Jersey and held invalid in *Wuchter v. Pizzutti, supra,* where the statute laid no duty whatever upon the Secretary

of State to communicate the process served upon him as the statutory agent of the defendant to the defendant.

Here the court is required to direct the steps to be taken which the Legislature has conceived as sufficient to communicate notice of the suit to the defendants.

Are those steps reasonably sufficient to bring knowledge home to the defendant? Before answering that question, it is necessary, in view of the course the argument has taken, to devote a moment of attention to what the statute must mean.

The statute does not, as some statutes do, lay down any requirement as to how the address of the defendant shall be ascertained to which the notice by mail may be sent. All that it provides as bearing on this is, that the bill of complaint must show that the defendant resides outside of Delaware—that he is a non-resident. Of course that gives no information as to where he might be reached by mail. In this case the bill by reference to an accompanying affidavit showed more—it showed addresses. In view of the duty laid upon the court to notify the defendant by mail, it is hardly to be conceived that the court would lightly dismiss the injunction thus laid upon it. It would, I conceive, be the duty of the court to exact some showing from the complainant of where the defendant could be found or some excuse as to why such information is unavailing. In the event that the defendant's whereabouts could not be stated, resort would have to be made to the alternative service by some other method if practicable. I so construe the statute.

In the next place the statute does not specify how the publication provided for shall be made, whether by posters, hand-bills or in newspapers. It specifies only the length of time for the publication. But the duty is expressly laid upon the court to make publication. In practice such publication has been the usual one by newspaper advertisement. Such publication has without exception so far as I know always been held sufficient as a form of substituted service.

It is not however specifically required by the statute. It was as a matter of fact resorted to in this case.

Now the defendants object to the statute, containing provisions of that sort, on the ground that there is nothing in them which would prevent the notice to be mailed to wrong addresses and the publication to be made in obscure places by such uninformative expedients as hand-bills and posters.

An objection of that sort, however, does not appear to me to be tenable as a ground for declaring the statute invalid under the due process clause. It assumes that in considering questions of attack upon a statute as violative of that clause, the statute must supply every detail necessary to be followed in the process of conveying notice to the defendants. It assumes that it is incompetent for the Legislature to lay the duty on courts to direct notice of pending suits to defendants in language of a general nature. I have seen no case to that effect. There are instances, I have no doubt, which a careful search of the cases would reveal, where language even less specific than that which is found in the statute here under review, has passed under judicial scrutiny without a word of criticism on that score. *Roller v. Holly,* 176 *U. S.* 398, 20 *S. Ct.* 410, 44 *L. Ed.* 520, contains an illustration of such a statute. In that case all the statute required in the matter of publicity was that the clerk of the court should address a notice to the non-resident defendant requiring him to appear. While the proceedings under review in that case were held invalid as having been without due process of law, the statute itself was not questioned. The reversal was based on the fact that only five days' notice had been given to the defendant who was absent a four days' journey from the place where he was notified to appear, and that this was so unreasonable as to render the notice nugatory.

When it is considered that the statute in question imposes the positive duty on the court to serve notice on the defendant by the methods designated, I know of no au-

thority which holds that it would be invalid because the court might possibly in the exercise of the duty of notification imposed by the statute resort to means and methods which would be unreasonable and therefore unavailing as lawful notice. If such methods were resorted to, due process would be violated. It is to be remembered that questions of due process are raisable not alone with respect to allegedly invalid legislative enactments; they may likewise be directed against the course and manner of conducting judicial proceedings.

The grievance, if any there can be under the present head, I conclude must be not against the statute, but against the manner in which the court has undertaken to carry out its terms. Publication for once a week for three consecutive weeks, if conducted under circumstances of reasonable notoriety, would alone be sufficient to satisfy the requirements of due process, unless possibly the defendants were known to be so far distant that by no reasonable probability could the notice get to them in time to be of practical value. If the court should resort to such a method of publication and for such a length of time as would be unreasonable as a vehicle of notice, due process of law would invalidate its proceedings, not because the statute is vulnerable but because the court's method of carrying out its mandatory provisions could not be said reasonably to effect a service upon the defendant.

In such a case as the instant one, the nature of the suit and the non-residence of the defendants exact as an absolute prerequisite of the court's power to proceed the seizure of some property belonging to the defendants. And where seizure has been made, as it has in the case before the court, it is contended by the complainants that the validity of the statute in the matter of notice is not left to rest alone on the publication and mailing provided for by the statute, however sufficient the provisions in that regard may be. The seizure, the complainants contend, is enough in itself, without regard to the exactions as to pub-

lication and mailing, to meet all the requirements of notice
necessary to satisfy due process of law, and *a fortiori,* it is
argued, when seizure is conjoined with publication and
mailing where practicable, ample means have been provided
for reasonably insuring the receipt of notice by the defend-
ants of the pendency of the suit against them.

The language of the statute is that "the Chancellor
shall have power to compel the appearance of the defendant
by the seizure of all or any part of his property," etc.  It
must of course be assumed that the non-resident owner of
property located in Delaware is aware of the liability of it
to be seized to compel his appearance in a suit brought
against him in the State and to be sold in satisfaction of
the demand asserted against him.

The object of the seizure is "to compel" the appearance
of the defendant, and after that has been accomplished, the
statute provides that the property may be sold in satisfac-
tion of the decree.  Since the seizure is to bring the defend-
ant before the court by compulsory appearance, it must
follow that any seizure which occurred too late to afford
the defendant an opportunity to do that, viz., appear, which
it is the object of the seizure to compel, would not be in ac-
cordance with the true meaning of the statute.  I construe
the statute, therefore, as necessarily meaning that it does
not permit of a seizure after, or at an unreasonably short
time before, the day named in the published order for the
defendant to appear so as to thereby preclude the defend-
ant from a reasonable opportunity to appear.  This con-
struction of the statute seems absolutely necessary.  It an-
swers the contention of the defendants that so far as the
statute is concerned it would be permissible for the appear-
ance order to fix one day and after that day, or very short-
ly before the day arrived, for the seizure to take place;
in which event the defendant, if he had obtained notice of
the order might properly ignore it on the ground of its lack
of power over him, and, after the date has passed, to be
trapped into a forced appearance through seizure and then

into a default decree. Any seizure must occur sufficiently long before the appearance day to enable the defendant to enjoy the privilege of appearing which the seizure is designed to compel. If the seizure were too late to secure this opportunity, then an alias order fixing another appearance day would be necessary. I cannot construe the statute to mean otherwise.

Having digressed to notice the meaning of the statute with respect to seizure in its time relation to the appearance day, I now come back to a consideration of the complainants' contention that the seizure of the defendant's property is itself notice to him of the pendency of the suit and the necessity of his appearing in defense if he would save the property from the consequences of an adverse decree.

The suit, as before stated, is in the nature of a suit *in rem*. In such a suit, does due process of law require any notice to the owner other than that which is conveyed by the seizure itself? It is rather singular that this question has not received such a definite and pointed answer by the courts as to make unnecessary the lengthy discussion of it which is found in the briefs filed in the pending case.

In *The Mary,* 9 *Cranch,* 126, 144, 3 *L. Ed.* 678, Chief Justice Marshall stated it to be a principle of natural justice that before the rights of an individual can be bound by a judicial sentence, he shall have notice, actual, or implied, of the proceedings against him. "Where," he says, "these proceedings are against the person, notice is served personally, or by publication; where they are *in rem*, notice is served upon the thing itself." To the same effect is *The Ann,* (*D. C.*) 8 *F.* 923, 5 *Hughes* 292. These were cases involving actions purely *in rem.* Notwithstanding their effect, we find the Supreme Court of the United States in the later cases of *Earle v. McVeigh,* 91 *U. S.* 503, 23 *L. Ed.* 398; *Windsor v. McVeigh,* 93 *U. S.* 277, 23 *L. Ed.* 914, and *Hassall v. Wilcox,* 130 *U. S.* 493, 9 *S. Ct.* 590, 32 *L. Ed.* 1001, stating by way of *obiter dictum* the law to be, that even in actions

*in rem* some form of notice to the defendant is necessary other than that conveyed by the seizure itself. On the other hand *Cooper v. Reynolds*, 10 *Wall.* 308, 19 *L. Ed.* 931, which arose prior to any of the last cited cases, indicated, in harmony with *The Mary, supra,* and *The Ann, supra,* that an attachment suit in its aspect of an action in the nature of an *in rem* proceeding is sustainable where the only notice to the defendant is that which is communicated by the seizure of his property.

In *Pennoyer v. Neff*, 95 *U. S.* 714, 727, 24 *L. Ed.* 565, the court uttered the dictum that—"The law assumes that property is always in the possession of its owner, in person or by agent; and it proceeds upon the theory that its seizure will inform him, not only that it is taken into the custody of the court, but that he must look to any proceedings authorized by law upon such seizure for its condemnation and sale."

Mr. Justice Holmes in *Herbert v. Bicknell*, 233 *U. S.* 70, 34 *S. Ct.* 562, 563, 58 *L. Ed.* 854, quoted this dictum with approval and added that "it has been said from of old that seizure is notice to the owner." This case, which was decided in 1913, comes very close to being one where under the facts it may be said that it was necessary to its decision to hold that seizure of the defendant's debt by way of a garnishment laid upon his debtor, was alone sufficient to constitute notice to the defendant of the pendency of the suit against him, because the notice that was attempted to be given him by substituted service was described by the court as "somewhat illusory."

The case of *Kwilecki v. Holman*, 258 *Mo.* 624, 167 *S. W.* 989, holds that seizure under an attachment statute of the property of a non-resident defendant is itself sufficient notice to the defendant to justify a default judgment against him, notwithstanding the statute under which the proceedings are conducted contains no provision for notice otherwise.

The dearth of authorities in which the immediate

question arose and in which it was therefore expressly decided is doubtless due to the fact that the statutes generally provide that notice by publication shall supplement the act of seizure.

In the instant case it is not necessary to hinge the decision of the question of notice upon the fact of seizure alone. Due process of law is not concerned with forms of procedure and methods of practice. All that it is concerned with, in the present connection, is whether or not, whatever may be the procedure adopted by the law, the defendant has in the regular course of proceedings been afforded notice and an opportunity before judgment to be heard in defense. *Louisville & N. R. Co. v. Schmidt,* 177 *U. S.* 230, 20 *S. Ct.* 620, 44 *L. Ed.* 747; *Simon v. Craft,* 182 *U. S.* 427, 21 *S. Ct.* 836, 45 *L. Ed.* 1165; *Coffin Bros. & Co. v. Bennett,* 277 *U. S.* 29, 48 *S. Ct.* 422, 72 *L. Ed.* 768.

When the statute under which the pending proceedings are conducted provides as it does, that publication of the order to appear shall be made at least once a week for three consecutive weeks, that the defendant shall also be notified by mail or otherwise if practicable, and that this notice, in cases where seizure of the defendant's property is absolutely essential to the court's jurisdiction, is in the nature of things necessarily supplemented by the further information that is conveyed by the act of taking from the defendant the possession of his property, I cannot bring myself to the view, so earnestly urged by the solicitors for the defendants, that the means provided for are not reasonably adapted to give the defendants notice of the proceedings against them. While there is no absolute assurance that notice would in fact be conveyed to the defendant in all cases where these means are resorted to, yet it is reasonably probable that it would. Due process does not assume to guarantee perfection in the service of notice in those cases where personal service is not required. All that it requires is that the substitute for personal service shall be such as to admit of the reasonable probability that notice will reach the defendant.

Third. The last and final point raised by the defendants is that the statutory notice does not require the defendants to be informed of the seizure of their property. The following cases are the principal ones cited in support of this contention. *Amparo Mining Co. v. Fidelity Trust Co.*, 74 *N. J. Eq.* 197, 71 *A.* 605, affirmed 75 *N. J. Eq.* 555, 73 *A.* 249; *American Land Co. v. Zeiss*, 219 *U. S.* 47, 31 *S. Ct.* 200, 55 *L. Ed.* 82; *Grannis v. Ordean*, 234 *U. S.* 385, 34 *S. Ct.* 779, 58 *L. Ed.* 1363; *Fenton v. Minnesota Title, etc., Co.*, 15 *N. D.* 365, 109 *N. W.* 363, 125 *Am. St. Rep.* 599. These cases are not applicable to such as the one now in hand. The distinguishing feature which renders them inapplicable is that in none of them was there a seizure of property. They were cases of bills to quiet title or of partition. A court entertaining such suits has of course power to proceed because of the location of the *res* within the jurisdiction, notwithstanding the non-residence of the defendant or defendants. Notice to the absent defendant by publication in such cases is recognized as proper and sufficient. And the cited cases indicate that the publication must advise the defendant of what the suit is about and disclose the *res*. But that is far from saying that where there has been an actual seizure of the defendant's property, there must be a like particularity of detail in the published notice. The defendants have cited no case, neither has my own investigation discovered any, where the principle of the cases cited by them is held applicable to a case in which the jurisdiction is founded on actual seizure.

If there is such a seizure, the owner-defendant who is deemed to be in possession of the seized property either by himself or through his agent, must be taken to be informed of the seizure as a matter of course. It cannot be assumed otherwise. If at the same time he has been notified of the suit, as we must assume he was through the publication and mailing of notice to appear, it would be to disregard the natural probabilities of ordinary mental operations to say that he would discover no connection between the notice

and the seizure of his *res*. The considerations which exact a certain detail of information in a notice of a suit directed against a *res* without its actual seizure, cannot apply with equal force where the notice is accompanied by an actual manucaption of the *res* or its legal equivalent.

Seeing no constitutional vice in the statute, and being of the opinion that it is applicable to the pending case, I conclude that the motion to vacate should be denied.

After writing the foregoing opinion and before filing the same, the Chancellor requested the solicitors to submit to him their views upon the purpose and meaning of that clause in the statute which provides that the Chancellor "may require the plaintiff to give approved security to abide any order of the Chancellor respecting said property," and particularly upon the question of whether said clause authorizes the Chancellor to exact of the complainants an indemnifying bond to secure the defendants against loss or damage occasioned by the seizure of their property in case the complainants should not prevail in the suit.

After the solicitors had presented their views upon the question, the following memorandum was filed by the Chancellor stating his conclusion with respect thereto; and, in addition, announcing the adoption of a rule of practice regarding the issuance of seizure orders in the future.

THE CHANCELLOR: It must be freely admitted that if the clause—"may require the plaintiff to give approved security to abide any order of the Chancellor respecting the said property"—was intended to authorize the exaction of a bond generally indemnifying the defendant against loss occasioned by what turns out to have been an unjustified seizure because it was authorized in aid of an unsustained case, the language used in expressing that intent is quite inartificial in its phraseology.

The solicitors for the complainants argue that the important words in the clause, "abide any order of the Chancellor *respecting said property*," cannot possibly admit of

the idea that the complainants may be ordered to indemnify the defendants against loss by reason of a seizure, because such an order would not be one respecting the property. The clause in the statute must, however, mean something. It cannot mean to provide for a restitution order because the complainants are not at any stage of the case put in possession of the property, and the sequestrator is placed under a safekeeping bond. The only meaning which the complainants suggest that the clause may have is that it authorizes the Chancellor to require security of the complainants that the costs incidental to the seizure or sequestration, such as compensation to the sequestrator, his expenses incurred for a bond and in the possible preservation of the property, shall be paid. When it is remembered that if the complainant is a non-resident, the existing rules provide that a bond with approved surety may be required of the complainant to cover all costs in a cause, which would include such items as were just specified, the complainants' suggestion comes down to this, that the Legislature meant to provide by the quoted clause that resident complainants might be required to give a bond to cover sequestration costs in seizure cases. If such was the intent of the Legislature, it expresses dissent from the settled view that as to the payment of costs taxable against residents of the State, the same have been always considered as amply safeguarded by the process of attachment for contempt to which residents, who are within the jurisdiction, may be easily subjected.

I am of the opinion that the narrow construction which the complainants would thus give to the clause, whereby it would serve only to secure sequestration costs from resident complainants, is not expressive of the legislative purpose. Why the Legislature should have been so solicitous to protect sequestration costs alone, it is difficult to perceive. It would seem that if costs were the subject of concern, costs generally, instead of those incidental only to the sequestration, would have been provided for. It is possible though hardly likely, that the Legislature set the legislative ma-

chinery to work for the purpose of grinding out an amendment (as the clause is) solely to provide for securing sequestration costs out of resident complainants. Such construction as would confine the clause to a mere matter of sequestration costs taxable against resident complainants would have it deal with a rather slight and petty object, which, in comparison with other and larger considerations that the application of the seizure remedy suggests, dwindles into relative insignificance.

The present case supplies an illustration immediately at hand of such considerations. In this case, as I calculate the total, about 368,339 shares of stock of various corporations standing in the names of the individual defendants, have been seized and are now held. Their value at the time of seizure, I estimate, to be over $1,300,000. It is manifest that the seizing *in limine* and the holding of the defendants' property in that amount until the termination of the litigation, which, judging from the character of the suit and the multitude of transactions included in it, may extend over a year or more, possibly over a period of years, is, in case the suit eventually proves unmeritorious, attended with possibilities of great financial loss and certainly of serious embarrassment to the defendant owners. The value of the seized property need not be so great as is found in the instant case, in order for there to be danger of loss and embarrassment to its owner. Indeed any one who finds control of his property wrested from him even though it be small in value, undergoes a damage.

At law an analogous remedy of foreign attachment is now in this State, as in many if not all of the others, available only when bond is given to indemnify the defendant from loss or damage occasioned by an unjustified seizure; which but emphasizes the fact that the possibilities of injustice to owners of property by its seizure *in limine* are recognized by the law-making assemblies.

The complainants, however, appear to take the position that the General Assembly of this State could not have had

such consideration in mind when it adopted the language in question, and that therefore the language is not to be read with any such considerations for a background.

The language is not as clear in its expression as legislative enactments ought to be. If, however, there be any room for deducing from it an intent to provide for some sort of indemnity, a thing which in reason would occur to anyone as wise and just and which experience in analogous proceedings at law has shown to be very generally recognized as desirable, it is far more reasonable to strive to deduce such an intent than to labor to reject it.

The complainants in their suggestion as to the sort of bond the clause is meant to authorize, describe an order which it seems to me is not any more clearly within the qualifying phrase, "respecting such property," than would be some type of order indemnifying the defendants from loss or damage occasioned by the act of the complainants in unjustly causing their property to be seized and held. That part of the order suggested by the complainants as contemplated by the clause which would provide for a cost bond, respects not so much the property as the suit; and the other part which would provide for payment of the expenses incurred by the sequestrator to preserve the property, is, if not relating to costs, in substance an indemnifying order to protect the sequestrator against loss or damage.

It appears then that the complainants when put to it to specify by illustration what the clause means, are caught on two horns of a dilemma—one of which is that costs respecting the suit, which are under no present need of safeguarding, are meant to be provided for; and the other of which is that an indemnity to the sequestrator was intended to be authorized which it seems to me can no more be "respecting the property" than would an order for indemnity to protect the defendants.

I realize of course that the intent of the Legislature in enacting a statute must be ascertained from the language used to express it, and that courts cannot evolve meanings

which the employed language will not justify. The fact that the court may be cognizant of the purpose of the Legislature in enacting certain language, will not justify the finding that such a purpose is expressed when the particular language in which it is said to be couched will not by any reasonable interpretation justify it.

· In seeking for the meaning of this language, the aid may be accepted of whatever light is shed by the circumstances in which the subject of the legislation was set and the considerations which reason, experience and the conceptions of justice naturally would suggest as present in the legislative mind. Such aids to interpretation are properly available when ambiguity is found in the language which is under examination.

The following sequence of events is of some significance. When the paragraph under review was first enacted, it did not contain the clause as to "approved security." The first case that arose under it was *Wightman v. San Francisco Bay Toll-Bridge Co.*, 16 *Del. Ch.* 200, 142 *A.* 783. In that case one hundred and twenty thousand shares of stock were sought to be seized. Notwithstanding the statute provided for no bond to be exacted of the complainants, I required a bond to be given. Some question was raised as to the power of the court to exact such a requirement. It is significant that at the next succeeding session of the Legislature the clause in question was written into the statute. The fact is that the *Wightman Case* focused attention on the absence of a provision for security to protect the defendants; and that the next succeeding Legislature adopted the clause now under notice. The truth is that there is a causal connection between the *Wightman Case* and the statutory clause referred to. That is the history of the matter.

So unreasonable is it that a non-resident's property might be seized on mesne process and held an indefinite length of time, only in the end possibly to be turned back to him, without provision for indemnity against loss or damage occasioned to the owner, that if there be any rea-

sonable construction of the statute possible which would yield the indemnity, such construction ought to be unhesitatingly adopted.

I think such construction of this statute is to a limited extent at least reasonably permissible.

It is to be observed, that the clause here under review contemplates two orders—first an order "respecting said property," and second an order for a bond "to abide" the first order. I proceed then to suggest an order which will harmonize with this view of the statute.

Suppose an order was phrased to this effect: that in the event the suit is discontinued or the bill for any cause dismissed, the shares of stock seized on application of the complainants and held by the sequestrator shall be released from the seizure and their possession restored to the individual defendants, the respective owners thereof, without loss or diminution in market value below that which said shares possessed when seized, and, to that end, if at the time such release and restoration of possession is effected the said shares are of less value as aforesaid, the defendants shall be paid in money an amount equal to the said loss in value of the shares belonging to each of the defendants respectively—such an order would be an order "respecting said property." It would, I consider, be within the literal language of the statute. The indemnity provided for by it would not be as general in extent as in my judgment ought, as a matter of justice, to be afforded. A statutory order, however, I take it, must fall within the terms of the statute, and the peculiar language of this statute makes necessary the devising of some language to fit it, if at the same time any part of the purpose which I believe it to have been designed to secure, is to be accomplished. I regret that the language of the clause was not made sufficiently broad to justify an indemnifying bond of more general extent. It is to be hoped that at the next session of the Legislature some broadening amendment to the clause will be adopted.

If such an order as I have suggested is entered, as it

will be, the complainants will be required to give bond with approved surety "to abide" it. The word "abide" is defined as a word of various meanings. Among others, it has the meaning of "to perform," "to obey." In *Jackson v. State,* 30 *Kan.* 88, 1 *P.* 317, 318, it is said to mean "obedience, compliance \* \* \* to 'perform,' to 'execute,' to 'conform to;'" and in *Hodge v. Hodgdon,* 62 *Mass.* (8 *Cush.*) 294, it is defined as "to 'perform,' to 'execute,' to 'conform to.'"

If the complainants give a bond with approved surety "to abide" such an order, they would be bound to obey or perform that portion of it which provides for a money payment as a means of making up the loss in value. I invite the solicitors for the defendants, who notwithstanding they have appeared only specially, as *amici curiae* to submit a draft of such an order.

The question will arise of what should be the amount of the bond. According to the information as to values which I have obtained, the seized shares had a market value when seized of $1,343,736.00. A few weeks ago, viz., on May 16, they had a market value of $869,819. By that time they had suffered a diminution in value therefore of $473,-917. In the face of such a showing, the complainants must be prepared to give a very substantial bond, if they would continue to keep the shares impounded. If my figures are correct, the demonstrated shrinkage which has already occurred would seem to supply the minimum measure of a bond. On this, however, the solicitors for the complainants may be heard if they desire.

Before concluding this discussion of the statute's meaning, I should say that the participation in the argument of it on briefs by the solicitors for the defendants was at my request and with the assurance that in doing so they would be acting solely as *amici curiae.* Their appearance specially for the purpose shown in the main opinion would not of course entitle them to be heard on the question of bond. Accordingly I invited their views with the understanding that their special appearance would not be enlarged into a gen-

eral one. I make this statement so that their position of specially appearing might not be prejudiced in case they desire to reserve for appeal the question decided in the main opinion.

One other matter remains to be mentioned. It is a matter which has occurred to me as needing some treatment, and about which my views are so positive that I am prepared to deal with it without the aid of any discussion from the solicitors.

I have been impressed with the necessity of some regulation applicable to these seizure cases at the very threshold of the suit. When the present bill was filed, there was no showing of the property proposed to be seized. In the *Wightman Case, supra*, there was. The specific shares to be seized in that case were stated by the bill, and some information was in hand therefore upon which to base a judgment as to the amount of bond to be required.

In this case no such information was disclosed by the bill. Accordingly the bond question was not in shape to be passed upon. The sequestrator was appointed and what was seized was unknown until after his report came in, at which time the motion to vacate was made and the question of security was shunted aside by the argument on that motion.

This case has demonstrated what use it is possible to make of the statute authorizing the seizure of property of non-residents located in this State. Shares of stock of Delaware corporations have their *situs* here and are therefore subject to seizure. In that respect, the Delaware law is I think no different from the law in other states. The shares being here, it is possible for a complainant who desires to sue a non-resident, to force his appearance by seizing his stock located here. Unless a rule of court is framed to regulate the matter, a complainant can under the statute throw out a drag net and fish through the records of every resident agent of Delaware corporations and enmesh every share of stock of such corporation owned by the defendant.

In the instant case the defendants happen to be in the business of buying and selling and underwriting stocks and bonds. In a sense they are merchants and their merchandise consists of securities. By securing a sequestrator to roam around and seize all the stock of Delaware corporations owned by the defendants or standing in their names, amounting as I have before stated to about 368,339 shares, the complainants have practically taken from the possession of the defendants a considerable portion of their merchandise and turned it over to the equivalent of a receiver *pendente lite,* before a single item of liability is established against them, on an *ex parte* application. Now that sort of thing is rather drastic. Such drag net enterprises are not to be encouraged. I expressly disclaim any purpose to characterize the present complainants or their solicitors, when I say that it is common knowledge that frequently the processes of courts are utilized by a certain class of litigants appropriately described by the expressive word "snipers." If such litigants are permitted to inaugurate suits against defendants who are reputed to be large holders of stock, and secure from the court an official "fisherman" to go forth in their behalf and drag a seine through the corporate waters in the blind search for the property of defendants in the hope that vexatious seizures might result, scandalous abuses could be perpetrated. There should of course be no obstacle thrown in the way of honest suitors who file their bills in the best of faith. How to obviate the possible abuses and at the same time preserve the rights of litigants who are actuated by a *bona fides* of purpose, is a difficult problem.

The provision for bond is one safeguarding mechanism. But it needs to be supplemented. There should be some provision also by rule whereby information is supplied to the court, before a seizure order is entered, by which some judgment as to the amount of bond to be required can be formed. In the instant case the final report of the sequestrator was not filed until a month after he had served no-

tice upon the corporations in which the defendants held stock. This was due to the inability of the corporations in question promptly to make up their certificates as to the shares held. In the meantime the large number of shares before stated together with many others standing in the names of some of the defendants but not owned by them, were arrested and not a dollar of idemnity was outstanding. Such a condition should not be permitted, if it is possible to avoid it.

Furthermore, some safeguard should be provided against what for want of a better term I may call fishing expeditions. It seems to me that complainants who seek to bring their adversaries into court by seizure of their property ought to be prepared to say with reasonable certainty what property they desire to have seized. It is hardly comportable with the dignity of the court to appoint a judicial agent to go forth on a hunt in behalf of a complainant and beat the bushes for him.

In part at least these objectional features can be safeguarded against by a rule of court to the effect that no order of seizure shall issue unless the complainant shall accompany his application with a verified statement showing the kind of property proposed to be seized, a reasonable description of it, its amount and estimated value, or, if any of these particulars cannot be stated, giving the reasons for the complainant's inability to state them, and the information upon which the complainant's belief as to any of the particulars is founded. A rule of court to this general effect will be formulated, with a provision that in any case the Chancellor may in his discretion dispense with a compliance with all or any part of the rule.

The rule-making power of the court, supplemented by the special provisions found in the seizure statute, permits of the adoption of such a rule.

I desire to repeat in order to emphasize what has been briefly indicated, viz., that the observations herein made concerning the possibilities of abuse which inhere in the

statute unless it is administered with some degree of cautious supervision and the strictures I have given expression to in that connection, are not in any sense to be understood as having any personal connection with the solicitors for the complainants. Those observations were occasioned by the presence in the profession, I regret to say, of a certain type of lawyer, rare though he be, whose conception of professional ethics is not what it should be—a characterization, I am glad to embrace the opportunity to state, which I believe it would be a great injustice even by innuendo, to attribute to the solicitors for the complainants.

Order accordingly.

After the foregoing opinion was filed, solicitors for the complainants were on application heard further upon the amount of the sequestration bond. They gave notice that they would move to release a large number of the shares from the seizure in order that the amount of the sequestration bond might not be made so large as it otherwise would be.

Such a release was in due course effected. The complainants also entered into a consent that any of the shares still held under seizure might be sold and the proceeds or other securities in which the same might be invested, substituted. Thereafter the Chancellor indicated that he would enter an order in the following form fixing the bond "to abide" at $250,000.00, based on the shares retained, and the appeal bond at $25,000.00:

"And now, to-wit, this twenty-fifth day of July, A. D. 1932, for the reasons set forth in the opinion of the Court filed in this cause on the Fourteenth day of June, A. D. 1932, and by virtue of the consent filed by the complainants in this cause on the Sixth day of July, A. D. 1932, hereinafter referred to,

"1. It is ordered by the Chancellor *ex mero motu* that if this suit be discontinued or the bill of complaint for any cause be dismissed, the shares of stock seized on the application of the complainants and held by the Sequestrator shall be released from seizure and possession thereof restored to the individual defendants, the

respective owners thereof, without loss or diminution in the market value thereof below that which said shares possessed when seized, and, to that end, if at the time such release and restoration is effected the said shares are of less value as aforesaid, the defendants shall be paid in money an amount equal to the said loss in value of the shares belonging to each of the defendants respectively; provided, however, that nothing herein contained shall be construed as creating any liability based on this order on the part of the complainants, or either of them, to pay said money or any part thereof to the defendants, or any of them, unless such bond as is described in paragraph two if this order be given.

"2. It is further ordered that the complainants shall on or before the Fifteenth day of August, A. D. 1932, file in the office of the Register in Chancery, in and for New Castle County, their joint and several bond, or the bond of either of them, with surety to be approved by the Chancellor, in the sum of ———— Thousand Dollars ($————), conditioned to abide the order set forth in paragraph one hereof, and the Court reserves the right to require a further bond or bonds from the complainants with approved surety if occasion should require it.

"In the event that said bond shall not be approved and filed within the time last above designated, the order or orders of this Court authorizing the seizure of the property of the individual defendants herein shall forthwith be vacated and the property so seized shall be released and discharged from such seizure, and the Sequestrator is directed in that event forthwith to notify the corporations (or the registered agents thereof) whose shares of stock belonging to the individual defendants have been seized, of the vacation of said order of seizure and of the release of said property from such seizure.

"It is further ordered that the immediately preceding paragraph in this order number 2 shall in any event be stayed in its operation for the period of five days from the date of this order, and in case the complainants within said five day period should take an appeal to the Supreme Court from the action of this Court in entering this order, as they have signified their intention of doing, then the said stay period of five days shall be enlarged and extended until after the Supreme Court has sent its mandate down to this Court; provided, however, that such enlarged stay shall not be operative unless the complainants, or either of them, shall give bond with surety approved by the Chancellor in the penal sum of ———— thousand dollars conditioned to indemnify the defendants and each of them against all loss or damage suffered by them, or each of them, by reason of said

appeal and in case the same should be dismissed, or the action of this Court should be affirmed and thereafter the suit discontinued in this Court or for any cause finally dismissed; and

"3. Whereas the complainants have on the Sixth day of July, A. D. 1932, filed in this cause their consent to the ¡sale or sales by the respective defendants, owners thereof, of the shares of stock, or any part thereof, remaining under seizure, or any interest therein, from time to time and at any time prior to a final decree in this cause, at not less than the current market prices thereof, and that the proceeds of such sale or sales may be reinvested as well as any moneys now or hereafter held under said sequestration order, in any obligation or securities listed on the New York Stock Exchange, New York Curb Exchange, or in any other securities as may be agreed upon, upon condition that the proceeds of such sale or sales, or the obligation or securities in which such proceeds shall be invested, as the case may be, shall be deposited with the Sequestrator to be by him held in lieu of the property so sold, in the same manner and with like effect as if originally sequestered in this cause,

"It is further ordered, that if any of said stock be sold in pursuance of said consent, the proceeds thereof and the obligations or securities, if any, held by the Sequestrator in the place thereof at the time of the discontinuance of said suit or dismissal of said bill of complaint for any cause, (in case said suit should terminate in a discontinuance or dismissal) shall for the purpose of fixing values at the time of release and restoration mentioned in the next immediately preceding paragraph of this order be treated and regarded as in substitution for the stock originally seized and sold and the values thereof at said time shall be taken and regarded as the value of the stock for which said proceeds, obligations or securities stand as a substitute.

"And it appearing that the complainants in this cause are non-residents of the State of Delaware,

"It is further ordered by the Chancellor that said complainants, or either of them, give bond in the usual form in the penal sum of five hundred dollars ($500.00), with surety to be approved by the Chancellor, on or before the Fifteenth day of August, A. D. 1932, to secure the costs of this proceeding, and the Chancellor hereby reserves the right to require additional cost bond if in his discretion such bond should be required."

The following memorandum accompanying the draft of order for bond "to abide" the order "respecting the property" seized, was filed:

THE CHANCELLOR: The amount fixed for the bond "to abide" is based on quotations of values as they have fluctuated during the period since the sequestration. In fixing this amount I have followed the opinion. Liberty to the defendants to now sell and convert, would not cure the situation if, when release from seizure comes, if ever, the values then are no more than now.

The amount of the bond exacted as a condition for stay during appeal, is considerably less. This is because first, no peculiar statute interferes to prevent a general indemnity bond; unlike the other bond, it is not required to respect property; second, the appeal bond is to cover damages from now on; third, the period during which damage can be suffered is very considerably less than the entire duration of the suit—it is only during the pendency of the appeal.

NOTE.—Before the order was signed the complainants moved to release more of the seized shares, nearly all of them, leaving only about $3,500.00 worth under seizure. Whereupon, an order in the above quoted form was entered, with the bond "to abide" fixed at $4,000.00 and an appeal bond at $1,000.00.