**George P. BAKER et al., Plaintiffs,**

**v.**

**Fidel GOTZ et al., Defendants.**

**Civ. A. Nos. 4072, 74–99, 74–145.**

United States District Court,
D. Delaware.

As Amended Jan. 23, 1975.

---◆---

William E. Taylor, Jr., Wilmington, Del., for plaintiffs; Morris L. Weisberg, of Blank, Rome, Klaus & Comisky, Philadelphia, Pa., of counsel.

Arthur G. Connolly and Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., for defendants; Saul L. Sherman of Busby, Rivkin, Sherman, Levy & Rehm, New York City, of counsel.

## OPINION

STEEL, Senior District Judge:

Pending for decision are identical motions by nonresident defendants in each of three cases to quash the sequestration of certain property purported to have been made under 10 Del.C. § 366 and Court of Chancery Rule 4(db),[1] Del.C. Ann.

---

1. 10 Del.C. § 366 reads in part:

§ 366. Compelling appearance of non-resident defendant

(a) If it appears in any complaint filed in the Court of Chancery that the defendant or any one or more of the defendants is a non-resident of the State of Delaware, the Court may make an order directing such non-resident defendant or defendants to appear by a day certain to be designated. Such order shall be served on such non-resident defendant or defendants by mail or otherwise, if practicable, and shall be published in such manner as the Court directs, not less than once a week for three consecutive weeks. The Court may compel the appearance of the defendant by the seizure of all or any part of his property, which property may be sold under the order of the Court to pay the demand of the plaintiff, if the defendant does not appear, or otherwise defaults.

. . .

Chancery Rule 4(db) reads:

(db) Service by Publication and Seizure.

(1) No order shall be entered under 10 Del.C. § 366 unless it appears in the complaint that the defendant or any one or more of the defendants is a non-resident of the State of Delaware and the application therefor is accompanied by the affidavit of a plaintiff or other credible person stating:

(a) As to each non-resident defendant whose appearance is sought to be compelled, his last known address or a statement that such address is unknown and cannot with due diligence be ascertained.

(b) The following information as to the property of each such defendant sought to be seized:

(1) A reasonable description thereof.

(2) The estimated amount and value thereof.

Each of the actions was brought by trustees of the Penn Central Transportation Company ("Penn Central"), debtor in proceedings for reorganization of a railroad pursuant to § 77 of the Bankruptcy Act, 11 U.S.C. § 205, Cause No. 70–347, pending in the United States District Court for the Eastern District of Pennsylvania. The plaintiffs presumably are residents of Pennsylvania, and the Penn Central is alleged to be a citizen of Pennsylvania and is organized under the laws of Pennsylvania with its principal office in Philadelphia, Pennsylvania.

The defendants in all of the three cases are Fidel Gotz, a citizen and resident of West Germany, numerous business entites, and in C.A. No. 4072, Volker Gotz, also a citizen and resident of West Germany.[2] Each of the entities is alleged to be a citizen of a foreign state and an independent juridical person organized and existing under the law of the principality of Lichtenstein. While the complaints vary slightly in language plaintiffs in each seek generally to recover a money judgment against each of the defendants based upon the alleged misappropriation by Fidel Gotz of $4,000,000 belonging to the Penn Central and held in trust by a "business" trust organized under the laws of Lichtenstein. The complaint in case one (C.A. No. 4072) alleges that the misappropriation was effected by Gotz for the "benefit of himself and/or one or more of the other defendants" acting in concert,

(3) The nature of the defendant's title or interest therein; and if such title or interest be equitable in nature, the name of the holder of the legal title.

(4) The source of affiant's information as to any of the items as to which the affidavit is made on information and belief.

(5) The reason for the omission of any of the required statements.

(2) Within three business days after the filing of such bond or bonds as may be required or within such other time as the court may fix, the Register shall, in addition to making the required publication, send by registered or certified mail to each defendant whose appearance is sought to be compelled a certified copy of the order and a copy of the pleading asserting the claim.

(3) After the filing of such bond or bonds as may be required by the order, but not later than 10 days after the date of the order of seizure, the sequestrator shall serve a certified copy of the order upon the person, persons or corporation having possession or custody of the property or control of its transfer, and shall seize the property. The sequestrator shall seize property which is, or appears, not to be susceptible of physical seizure within the state by serving a direction in writing that the person, persons or corporation having possession or custody of the property or control of its transfer, shall:

(a) retain the property and recognize no transfer thereof until further notice from the sequestrator or order of the Court;

(b) forthwith make a notation upon any records pertaining to the property that such property is held pursuant to the order of the Court; and

(c) within ten days after the date of such service, deliver a certificate under oath to the sequestrator, specifying (i) such defendant's property, if any, of which it has possession, custody or control or control of its transfer; (ii) whether the title or interest of each such defendant is legal or beneficial; and (iii) if legal, the name and address of the holder of any equitable title or interest therein, if known, and, if beneficial, the name and address of the holder of the legal title thereto, if known.

(4) Within twenty days after seizure, unless otherwise specially ordered, the sequestrator shall make his return to the court, therein setting out all proceedings hereunder to the date of said return, including the date and hour of service and seizure pursuant to subdivision (3) hereof.

(5) The court may in its discretion and subject to statutory requirements dispense with or modify compliance with the requirements of any part of this rule in any cause upon application to it stating the reasons therefor.

2. More specifically, the defendants in case one (C.A. No. 4072) are as follows: Fidel Gotz, Finanz Aktiengesellschaft, Vileda Anstalt, Gotz Aktiengesellschaft of St. Gallen, Inter-Industry Aktiengesellschaft of St. Gallen, Inter-Marketing Corp. Anstalt, Volker Gotz, Minolta Anstalt, Finana AG St. Gallen. In case two (C.A. No. 74–99) and in case three (C.A. No. 74–145), the defendants are as follows: Fidel Gotz, Vileda Anstalt, Inter-Marketing Corporation Anstalt, Minolta Anstalt, and Finanz Aktiengesellschaft.

combination and conspiracy with others and themselves. Case two (C.A. No. 74–99) alleges that the appropriation although effected by Gotz acting in concert with the other defendants was for the "benefit of himself", but that the actions of the other defendants were willful, wanton and malicious and hence entitle plaintiffs to recover punitive or vindictive damages against them. The complaint in case three (C.A.No. 74–145) alleges essentially the same claim as does the complaint in case two.

Case one (C.A.No. 4072) was instituted in March 1971 by an ex parte sequestration order which this Court on December 20, 1971 held to be unlawful.[3] See Baker v. Gotz, 336 F.Supp. 197 (D. Del.1971). This was reversed by a three judge panel of the Court of Appeals (one dissent) in an unreported opinion filed August 31, 1973. Upon rehearing by the Court en banc the eight judges were evenly divided in an opinion filed February 21, 1974, 492 F.2d 1238 (3rd Cir. 1974). Thereafter plaintiff sought certiorari in the Supreme Court of the United States. The application was denied, 417 U.S. 955, 94 S.Ct. 3084, 41 L. Ed.2d 674 (1974). On June 17, 1974, the mandate of the Court of Appeals was issued to this Court affirming the judgment of this Court dated December 20, 1971. On June 24, 1974, plaintiffs sought and obtained a new sequestration order which is the subject of one of the pending motions.

Case two (C.A.No. 74–99) was begun on May 23, 1974, and a sequestration order was obtained in it substantially identical with the order of June 24, 1974 in case one (C.A.No. 4072). That order is likewise the subject of a pending motion to quash.

Case three (C.A.No. 74–145) was brought in the Court of Chancery of Delaware and on June 12, 1974, a sequestration order was obtained substantially identical with the orders in cases one and two obtained respectively on June 24, 1974 and May 23, 1974. Thereafter the action was removed to this Court by defendants. The third motion to quash is directed against the June 12, 1974 order entered by the Court of Chancery.

The following property of the defendants has purportedly been sequestered:

(a) property of defendant Vileda Anstalt (Establishment) as follows:

(1) one 6¾% subordinated debenture of SSI Computer Corporation (now called Itel Corporation or Itel Computer Leasing Corporation), a Delaware corporation due January 15, 1989, issued on November 25, 1969 to Vileda Establishment, in the face amount of $500,000 certificate number R 739.

(2) a warrant of Itel Corporation, a Delaware corporation, issued on December 8, 1969 to Vileda Establishment, to purchase 10,000 shares of common stock at a price of $29.00 per share and void after January 15, 1979, certificate number WS 2242.

(b) property of defendant Inter-Marketing Corporation Anstalt (Establishment) as follows:

(1) one 7% subordinated note due May 1, 1978 of SSI Computer Corporation (now called Itel Computer Leasing Corporation or Itel Corporation), a Delaware corporation issued on March 10, 1970 to Inter-Marketing Corporation, Est. in the face amount of $1 million.

(2) 50 shares of common stock of Itel Corporation, a Delaware corporation, certificate number NF 1535, issued to Inter-Marketing Corporation.

(3) warrant of SSI Computer Corporation (now called Itel Corporation or Itel Computer Leasing Corporation), a Delaware corporation, to purchase 15,000 shares of common stock void after May 1, 1978, certificate number

---

3. An order on December 20, 1971 vacated the sequestration but provided that the effectiveness of the order should be suspended for five days to enable the plaintiffs to pursue any right of review which they might have.

W–099, issued to Inter-Marketing Corporation, Est. on March 13, 1970.

(4) one 7½% convertible subordinated note due May 1, 1983 of CBK Agronomics (now called General Energy Corporation), a Delaware corporation, issued on March 12, 1970 to Inter-Marketing Corporation, Est., in the face amount of $300,000.

(c) property of Minolta Anstalt (Establishment) as follows:

Six 8% notes of Textron Atlantic, Inc., a Delaware corporation, guaranteed by Textron, Inc., a Delaware corporation, dated May 15, 1970, maturing on May 15, 1975, acquired pursuant to an agreement dated April 27, 1970, and payable to Minolta Anstalt in the following amounts:

| Note Numbers | Face Amount (Swiss Francs) |
|---|---|
| RA–01 | 4,000,000 |
| RA–02 | 4,000,000 |
| RA–03 | 4,000,000 |
| RA–04 | 4,000,000 |
| RA–05 | 4,000,000 |
| RA–06 | 5,360,000 |
| | 25,360,000 |

Plaintiffs have taken the position that: (Doc. 136, p. 2 in answer to the Court's letter dated November 6, 1974)

a) In C.A.No. 4072 the sequestrations against the following defendants may be quashed:

Volker Gotz

Gotz Aktiengesellschaft of St. Gallen (also known as Gotz AG of St. Gallen, or Gotz Anstalt of St. Gallen, or Gotz Etablissement of St. Gallen, or Gotz Establishment of St. Gallen)

Inter-Industry Aktiengesellschaft of St. Gallen (also known as Inter-Industry AG of St. Gallen, or Inter-Industry Anstalt of St. Gallen, or Inter-Industry Etablissement of St. Gallen, or Inter-Industry Establishment of St. Gallen), and

Finanz AG St. Gallen

and that the sequestrations are valid only as to the following defendants:

Fidel Gotz,
Finanz Aktiengesellschaft,
Vileda Anstalt,
Inter-Marketing Corp. Anstalt (also known as Inter-Marketing Corp. Etablissement, or Inter-Marketing Corp. Establishment)
Minolta Anstalt

b) In C.A.No. 74–99 and C.A.No. 74–145 the sequestrations are valid as to the following defendants:

Fidel Gotz
Vileda Anstalt
Inter-Marketing Corporation Anstalt
Minolta Anstalt
Finanz Aktiengesellschaft

Defendants have advanced a number of reasons why the challenged sequestrations should be quashed.[4]

As one ground defendants argue that the property purportedly sequestered consists of negotiable securities under the Uniform Commercial Code and since the certificates have not been actually seized and are not in Delaware the obligations which they represent have no situs in Delaware and cannot be validly sequestered under 10 Del.C. § 366.[5] Plaintiffs on the other hand contend that the obligations themselves which the instruments represent are intangibles and that they have not been merged into the

4. These are:
 1. The sequestrations are an improper attempt to relitigate matters already determined;
 2. Four months before case one was instituted, Vileda transferred the securities which were purportedly sequestered;
 3. No bona fide complaint has been filed against Minolta and Inter-Marketing;
 4. The securities purportedly sequestered are negotiable investment securities located outside of Delaware and the certificates which evidence them have not been seized;
 5. The seizures are unconstitutional.

5. Defendants do not press this argument as to the 50 shares of Itel stock which defendants concede has a situs in Delaware for purposes of jurisdiction under 8 Del.C. § 169.

certificates but retain their status with a situs in Delaware, the state where the issuers were incorporated. Plaintiffs argue that this is so regardless of whether the sequesered property is negotiable by the terms of the Uniform Commercial Code.

Several of the instruments read in conjunction with the choice of law provision in the Uniform Commercial Code (§ 1–105(1)) suggest a possible choice of laws problem between the law of the forum and the laws of California and New York.[6]

■■■■ In the absence of a provision in the instrument itself specifying the controlling law, the Delaware choice of law rule is that where an alleged interest in a security arises in a foreign jurisdiction the law of that jurisdiction governs the existence of the interest and presumably its nature, and the law of Delaware determines whether the interest is one which may be sequestered under 10 Del.C. § 366. Cheff v. Athlone Industries, 233 A.2d 170, 173 (Super.Ct. Del.1967); U. S. Industries v. Gregg, 348 F.Supp. 1004, 1016 (D.Del.1972). If the instrument provides that the law of a foreign state is to govern, § 1–105 of the Uniform Commercial Code gives

that choice of law effect if "the transaction bears a reasonable relation" to that state. However, if the transaction bears no reasonable relation to the foreign state but does bear such a relationship to the forum state, the laws of the latter will govern. § 1–105(1).[7]

■■■ The choice of law problem is more academic than real, for the Court has concluded that the property purportedly seized is a negotiable instrument under the laws of Delaware,[8] as well as California[9] and New York,[10] and under either law that interest cannot be validly sequestered without a physical seizure of the security certificates.[11]

The Uniform Commercial Code became effective in Delaware on July 1, 1967 by the passage of 55 Del.L., ch. 349, and presently appears in Title 5A of the Delaware Code Annotated. Before discussing the question of whether or not under the Code the property involved was subject to sequestration notwithstanding the Court's failure to seize the security certificates themselves, the status of the law in Delaware prior to the enactment of the Uniform Commercial Code requires examination.

The most illuminating decision suggestive of what a Delaware Court

---

6. The shares of Itel company stock are excluded from this and further discussion.

7. The Textron Atlantic notes state that they shall be governed by and construed in accordance with the law of New York. An examination of the notes discloses that they bear no reasonable relationship to New York but have been issued by a Delaware corporation. Therefore they bear a reasonable relationship to Delaware, and its law controls whether the holder is the owner of a negotiable instrument. (§ 1–105(1) U.C.C.)

The subordinate note of SSI Computer Corporation states that it has been made and delivered in California and shall be governed by the laws of California. The warrant of SSI Computer Corporation contains substantially the same provision. The issuance of the note to the holders bears a reasonable relationship to California and the issue of the negotiability of the instrument must be determined by California law. (§ 1–105(1) of the U.C.C.)

The note of CBK Agronomics, Inc. states that it entitled the holder to the benefit of

an agreement dated June 3, 1968 between the company and the purchaser. The agreement states that it shall be construed in accordance with and governed by the laws of the state of New York applicable to contracts executed and performed entirely therein. It also discloses that the note was issued and paid for in New York. It therefore bears such a reasonable relationship to New York to make its laws determinative of its negotiability. Compare Landau v. Best, 41 Del.Ch. 1, 187 A.2d 75, 76 (1962).

8. 5A Del.Code (Supp.1971).

9. Cal.Unif.Comml.Code (West).

10. N.Y.Unif.Comml.Code (McKinney 1964).

11. The Uniform Commercial Code in California and New York is in all relevant respects identical with that in Delaware except for § 8–317(1). New York and California enacted the section as proposed by the Drafters of the Uniform Commercial Code whereas Delaware has enacted its own unique provision. See discussion *infra*, p. 1390.

would have declared the law to be if the present case had arisen before the Uniform Commercial Code was enacted is that of Chancellor Seitz in Weinress v. Bland, 31 Del.Ch. 269, 71 A.2d 59 (1950). There the Court held, among other things, that an indebtedness evidenced by a non-negotiable note owed by a Delaware corporation and held outside of Delaware by a non-resident defendant is property which has a situs in Delaware because the debtor was subject to the control of the Court and could be sequestered under the Revised Code of Delaware 1935, 4374. Sec. 8, the earlier version of 10 Del.C. § 366.

The defendants in *Weinress* urged that principles established in Bank of Jasper v. First National Bank of Rome, 258 U.S. 112, 42 S.Ct. 202, 66 L.Ed. 490 (1921) required the vacation of the sequestration. Rejecting this argument the Chancellor noted that the *Bank of Jasper* case involved a negotiable certificate of deposit, saying at p. 67 of 71 A. 2d:

> "Here the debt is evidenced by a non-negotiable note. While the collateral is 'negotiable', it does not constitute the evidence of the obligation which is being seized. My decision is entirely consistent with the concept of negotiability."

The *Bank of Jasper* case held that a Florida court was without jurisdiction to decide that a Florida bank was without liability to a non-resident holder of the bank's negotiable certificate of deposit which was located outside of Florida. At p. 119, of 258 U.S., at p. 204 of 42 S.Ct. the Court said:

> "As neither the certificates of deposit nor the holder thereof were within the state of Florida, its courts could not —in the absence of consent—acquire

jurisdiction to determine the liability of maker to holder."

In reliance upon the *Bank of Jasper* decision counsel agreed in Landau v. Best, 41 Del.Ch. 1, 187 A.2d 75 (1962) that if the property which had been sequestered in that case, i. e., registered debentures, was negotiable it had no situs in Delaware and the sequestration could not stand, whereas if it was non-negotiable it could be sequestered under the holding in the *Weinress* case, notwithstanding the failure to seize the debenture certificates. A further agreement of counsel was to the effect that the question of negotiability was to be determined by New York law as specified in the indenture. With these stipulations before it, the Court held that under the New York law then in effect the debentures, being "registered debentures," were not negotiable and hence were sequesterable.[12]

Based upon the foregoing Delaware decisions and that of the Supreme Court of the United States in *Bank of Jasper, supra*, the Court concludes that before the enactment of the Uniform Commercial Code neither a negotiable instrument nor any obligation which it evidenced could be sequestered in Delaware without seizure of the instrument. The adoption of the Uniform Commercial Code which was enacted after the cited decisions were rendered, gives rise to two questions: first, whether the property seized constituted negotiable instruments, and if so, second, whether they or the obligations which they represented can be sequestered under 10 Del. C. § 366 without a seizure of the instruments themselves.

Section 8–102(1) of the Uniform Commercial Code reads:

> "(1) In this Article unless the context otherwise requires

---

12. Since the adoption of the Uniform Commercial Code in New York in 1964 the fact that an instrument is in registered form does not prevent it from being negotiable. *See* N.Y.Unif.Comml.Code § 8–101 et seq. (McKinney's Consol.Laws, c. 38, 1964). *See also* the Official Comment of Article 8 dealing with "Investment Securities" which appears following § 8–101, "Thus the Article [8] deals with bearer bonds, formerly covered by the Uniform Negotiable Instruments Law, and with registered bonds, not previously covered by any Uniform Law."

(a) A 'security' is an instrument which

(i) is issued in bearer or registered form; and

(ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; and

(iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.

(b) A writing which is a security is governed by this Article and not by Uniform Commercial Code—Commercial Paper even though it also meets the requirements of that Article. This Article does not apply to money.

(c) A security is in 'registered form' when it specifies a person entitled to the security or to the rights it evidences and when its transfer may be registered upon books maintained for that purpose by or on behalf of an issuer or the security so states.

(d) A security is in 'bearer form' when it runs to bearer according to its terms and not by reason of any indorsement."

Section 8–105 of the Uniform Commercial Code states:

"Securities governed by this Article are negotiable instruments."

Plaintiffs concede that the following "intangibles" are investment securities within the meaning of § 8–102(1)(a). (Doc. 136, p. 13 in answer to the Court's letter dated November 8, 1974).

### Shares and Warrants

| | | | |
|---|---|---|---|
| (1) | Vileda | -warrant (10,000 shares) | Itel |
| (2) | Inter-Marketing-warrant (15,000 shares) | | Itel |
| (3) | Inter-Marketing-shares (50) | | Itel |

### Debenture

| | | | |
|---|---|---|---|
| (4) | Vileda | -debenture ($500,000) | Itel |

Plaintiffs deny that the following "intangible investment securities" are embraced within the meaning of § 8–102(1)(a). (Doc. 136, p. 10–12 in answer to the Court's letter dated November 7, 1974).

### Notes

| | | |
|---|---|---|
| (5) | Inter-Marketing-note ($1,000,000) | Itel |
| (6) | Inter-Marketing-note ($300,000) | CBK Agronomics |
| (7) | Minolta -notes (26,360,000 S.F.) | Textron |

The argument that items (5), (6), and (7) were not investment securities is based upon defendants' admission that they were never traded publicly and defendants' failure to show that they otherwise fall within the coverage of § 8–102(1)(a), (2). See Doc. 136, p. 12 in answer to the Court's letter dated November 7, 1974).

The fact that defendants concede that the Itel, Agronomics and Textron notes were never publicly traded is not important. All that § 8–102(1)(a)(ii) requires for an instrument to qualify as

an investment security is that it be "of a type commonly dealt in upon securities exchanges or markets" etc. Plaintiffs would read this paragraph as if the words "of a type" had been omitted. The Practice Commentary to § 8–102 of the New York Uniform Commercial Code (identical with that in Delaware) discloses that plaintiffs' interpretation of § 8–102(1)(a)(ii) is erroneous. It reads:

> "It should be noted also that whether or not there is a market for the particular instrument is not the controlling factor, if the instrument is 'of a type commonly dealt in upon securities exchanges or markets' and 'by its terms is divisible into a class or series of instruments.' Thus a certificate representing 200 shares, being the entire authorized capital stock of a small corporation will meet both criteria and fall within the definition." [13]

As to the item (7) notes the plaintiffs argue that they do not fall within the coverage of § 8–102(1)(a)(iii) in that they are not one of a class or series or by their terms divisible into a class or series of instruments. (Doc. 136, p. 14 answer to the Court's letter dated November 8, 1974). This contention is answered by the terms of the note itself, a copy of which is attached to the affidavit of Volker Gotz, verified July 19, 1971 (Doc. 44). This shows that six of the notes issued, five in the amount of 4,000,000 Swiss francs and the sixth in the amount of 5,360,000 Swiss francs, or a total of 25,360,000 Swiss francs. They are patently "one of a class or series" under § 8–102(1)(a)(iii).

Thus each of the items of the property sequestered satisfy the definition of an investment security as defined in the Uniform Commercial Code and by its terms is a negotiable instrument. Nevertheless, plaintiffs insist that they may be sequestered under 10 Del.C. § 366 regardless of the fact that the instruments have not been seized. This argument rests primarily upon the failure of the Delaware Legislature to enact § 8–317 as proposed by the Draftsmen of the Uniform Commercial Code, as did other states which enacted the Code, and to have enacted in lieu thereof its own unique version of § 8–317.

The version of § 8–317(1) suggested by the Draftsmen of the Uniform Commercial Code is:

> "§ 8–317. *Attachment or Levy Upon Security*
>
> (1) No attachment or levy upon a security or any share or other interest evidenced thereby which is outstanding shall be valid until the security is actually seized by the officer making the attachment or levy but a security which has been surrendered to the issuer may be attached or levied upon at the source."

Section 8–317 as enacted by the Delaware Legislature reads:

> "§ 8–317. *Effect on attachment and sequestration laws; attachment or levy upon security*
>
> (1) Nothing contained in this title shall repeal, amend or in any way effect [sic] the provisions of sections 169 and 324, title 8, or sections 365 and 366, and chapter 35, title 10; and to the extent that any provision of this title is inconsistent with such sections, sections 169 and 324, title 8, and 365 and 366 and chapter 34, title 10, shall be controlling."

■ Plaintiffs emphasize that Delaware has rejected § 8–317(1) as proposed by the Code Draftsmen and in its

13. The Practice Commentary to § 8–102 of the New York Uniform Commercial Code was written by Prof. Carlos L. Israel. As appears from the July 1958 issue of the Business Lawyer at p. 676, footnoting the article Investment Securities as Negotiable Paper–Article 8 of the Uniform Commercial Code, Professor Israel is described as:

"Member of the Enlarged Editorial Board of the American Law Institute and the National Conference of Commissioners on Uniform State Laws, Sponsors of the Uniform Commercial Code, and Chairman of its subcommittee on Article 8—Investment Securities; member of the Section's Committee on Uniform Commercial Code."

stead has enacted its own version which plaintiffs contend has expressly "saved" the Delaware sequestration laws. From this premise plaintiffs argue that the Legislature intended that a debt owed by a Delaware corporation to a non-resident defendant should not be merged into the instrument which repesents the debt regardless of whether the instrument meets the definition of an investment security under the Uniform Commercial Code. As a consequence, so plaintiffs' argument goes, sequestration of the intangible obligation represented by the instrument is permissible under 10 Del.C. § 366 without a seizure of the instrument. This argument is untenable. The failure of the Legislature to adopt § 8–317 which the Draftsmen of the Code had proposed left the law as to negotiable instruments, except stock of a Delaware corporation which the Legislature had declared to have a situs in Delaware, precisely where it was before. That is to say that a negotiable instrument, other than stock, was not and is not subject to sequestration without seizure of the instrument. This was also the intended effect of § 8–317 in the form enacted by the Legislature.

The language of § 8–317 as well as its legislative antecedents bears this out.

Section 8–317(1) as enacted by the Delaware Legislature provides that to the extent that certain provisions of Title 5A, the Uniform Commercial Code may be inconsistent with sections 169 and 324, Title 8, or sections 365 and 366, and chapter 35, Title 10, the sections specified shall be controlling and are not repealed, amended or in any way effected by the Uniform Commercial Code. None of the sections referred to deal with the sequestration of obligations of Delaware corporations, although section 366 au-

thorizes the sequestration of "property" without defining it.

Section 169 states that the situs of stock of Delaware corporations is in Delaware for purposes of jurisdiction or attachment. It says nothing about options or warrants to purchase stock or corporate obligations of any kind. Section 324 deals with attachment (not sequestration) of stock and options to purchase stock. The power of the Court of Chancery to sequester stock does not have its origin in section 324 but springs from the historic and inherent power of equity. Greene v. Johnston, 34 Del.Ch. 115, 99 A.2d 627 (1953).[14]

Sections 365 and 366 of Title 10, respectively, authorize seizure of property in equity (sequestration) in proceedings strictly in rem and quasi in rem. They do not undertake to enlarge the field of property subject to seizure. Greene v. Johnston, *supra*, p. 633. Chapter 35 of Title 10 sets forth the procedures for attachment at law, not sequestration in equity.

The language of § 8–317 itself thus makes it clear that it was not intended to have any effect upon the general provisions of Article VIII of the Uniform Commercial Code. Its limited purpose was to eliminate the necessity of seizing certificates for shares of stock[15] in order to validly attach the shares as would have been required under the provision of § 8–317 as proposed by the Draftsmen of the Uniform Commercial Code. The historical background of § 8–317 further confirms and throws additional light on the limited effect it was designed to have.

For many years stock of a Delaware corporation was attachable in a foreign attachment action by procedures specified today in 10 Del.C. §§ 3506, 3508

---

14. *Sequestration is an equitable proceeding analogous to foreign attachment at law. Greene v. Johnston, supra,* p. 637. Foreign attachment derives from colonial acts and in its present form finds authorization in 10 Del.C. § 3506 et seq. Statutory authority for the attachment of shares in actions at law was conferred by 7 Del.L. Ch. 154

(1829) and in its present form is found in 8 Del.C. § 324. Greene v. Johnston, *supra*, p. 631.

15. Stock falls within the definition of an investment security under § 8–102(1) and hence is negotiable by the terms of § 8–105.

and in similar forerunners. 2 Woolley on Delaware Practice §§ 1182–1186. Their attachment required no seizure of the certificates but only service of a certified copy of the writ of foreign attachment upon specified officers or the resident agent of the issuing corporation. See 2 Woolley on Delaware Practice § 1183.

In 1945 the Legislature amended Chapter 65, Corporations, Revised Code of Delaware 1935, by adding immediately after 2048. Sec. 16, twenty-three new paragraphs designated 2048A. Sec. 16A. through 2048X. Sec. 16X. 45 Del.L., ch. 159, § 2 (1945). The added sections were those of the Uniform Stock Transfer Act (U.S.T.A.). Section 2048M. Sec. 16M. and 2048X. Sec. 16X. provided:

"2048M. Sec. 16M. No Attachment or Levy Upon Shares Unless Certificate Surrendered or Transfer Enjoined:—No attachment or levy upon shares of stock for which a certificate is outstanding shall be valid until such certificate be actually seized by the officer making the attachment or levy, or be surrendered to the corporation which issued it, or its transfer by the holder be enjoined."

"2048X. Sec. 16X., Inconsistent Legislation Repealed:—All statutes or parts of statutes of this State and all other provisions of this Chapter that are inconsistent with said 2048A. Sec. 16A. to 2048X. Sec. 16X., both inclusive, are hereby repealed to the extent of such inconsistency only."

At the same time, 45 Del.L., ch. 159 § 3 (1945) further amended chapter 65, Revised Code of Delaware 1935, by adding to and at the end of 2125. Sec. 93[16] the following:

"Provided, however, that such attachment shall not have been sufficiently completed to be valid until the provisions of 2048M. Sec. 16M. of this Chapter shall have been complied with."

The effect of these amendments to the General Corporation Law in 1945 was to require the seizure of the certificates of stock of a Delaware corporation as a condition to the valid attachment of the shares and to eliminate the prior practice of attaching shares simply by serving a certified copy of the process upon an officer or resident agent of the corporation. In short, it was to change the law as to the manner in which shares could be attached.

In 1951 Chapter 65, Revised Code of Delaware 1935, relating to corporations was further amended by 48 Del.L., ch. 353 (1951). Section 16 thereof amended 2048X. Sec. 16X., as amended in 1945, by striking out the section and inserting in lieu thereof the following:

"Sec. 16X. Existing Attachment and Sequestration Laws Unaffected: —Nothing contained in Sections 16A. to 16W. shall be deemed to repeal, amend, or in any way affect the provisions of Sections 92, 93 and 94 of this Chapter or Section 8 of Chapter 117 of the Revised Code of Delaware of 1935, and to the extent that Sections 16A. to 16W. are inconsistent with such Sections, Sections 92, 93 and 94 of this Chapter and Section 8 of Chapter 117 of the Revised Code of Delaware of 1935 shall be controlling."

By this amendment to sections 16X. and 16M. of the Uniform Stock Transfer Act, the provisions which had required the seizure of the certificates as a condition to the valid attachment of shares was eliminated, and the prior practice of permitting the attachment of stock by the service of a certified copy of process upon an officer or resident agent of the corporation was reinstated.

In 1967 the General Corporation Law of Delaware as it then existed was then repealed in its entirety and a general revision of the law was adopted. 56 Del. L., Part 1, ch. 50 (1967). This, of course, had the effect of repealing effec-

16. Revised Code of Delaware 1935, 2125 Sec. 93 authorized the attachment of shares of stock by the service of a certified copy of the process upon an officer or the resident agent of the issuing corporation. It did not require seizure of the certificates.

tive July 5, 1967, the Uniform Stock Transfer Act, *id.* §§ 201–202, p. 183–184, (including the sections 16X. and 16M. as modified in 48 Del.L., ch. 353) which had been a part of the prior general corporation law, and replaced it with the Uniform Commercial Code adopted by 55 Del.L., Part 2, ch. 349, approved June 2, 1966, effective July 1, 1967.

■ From the foregoing it is apparent that section 8–317 of the Uniform Commercial Code as enacted in Delaware only had the effect and no other, of perpetuating the procedures for *attaching shares of stock* as the same had existed under the terms of the Delaware law prior to the enactment of the Uniform Commercial Code, that is without a seizure of the certificate.[17]

In a commentary and analysis on the Delaware corporation law by Professor Ernest L. Folk, III, the author states that the key consideration whether an *obligation* of a Delaware corporation has a situs in Delaware for purposes of sequestration is whether it is a negotiable instrument:

"If it is negotiable, then it does not have a Delaware situs and may not be seized. In other words, unlike stock of a Delaware corporation the situs of a negotiable bond issued by a Delaware entity is not in Delaware but follows the certificate. On the other hand, if the indebtedness is represented by a non-negotiable instrument, then it is like any other debt and retains a Delaware situs and may thus be seized under the sequestration process." (p. 592)

■ When the instant case was before the Court of Appeals at an earlier stage, the majority (Judges Adams and Van Dusen) quoted the above statement by Professor Folk with apparent approval. However, they left open for determination by this Court which, if any, of the securities which had been sequestered were negotiable and the resolution

by this Court of the significance of section 8–317(1) of the Uniform Commercial Code. Judge Gibbons, writing for the minority, stated that the notes, debentures, and warrants which had been sequestered were investment securities under § 8–102(1)(a) and that under § 8–105(1) of the Uniform Commercial Code their situs was where the instruments were located. The conclusion reached by this Court is in accord with Judge Gibbons' views.

It follows that of all the property purportedly sequestered only the 50 shares of Itel stock constituted property which was sequesterable. However, defendants advance several reasons why even the sequestration of the stock should be quashed.

■ First, defendants argue that the sequestrations are nothing more than an improper attempt to relitigate matters already determined. In March of 1971 an ex parte sequestration order was obtained by plaintiffs in case one (C.A.No. 4072). As a result of statements in that proceeding given to the sequestrator by the Delaware corporations upon whom copies of the sequestration order had been served, the plaintiffs obtained information as to the quantity and identity of the debentures, notes, warrants and stock owned by certain of the non-resident defendants. The March 1971 order was held to be invalid in Baker v. Gotz, *supra*, because the affidavit upon which the order was procured was lacking in the degree of specificity required by the Delaware Chancery rules. However, the specific information obtained thereby as to property which the defendants owned was used by plaintiffs to obtain the sequestration orders which are presently attacked. Defendants assert that the information which plaintiffs have thus utilized was the result of a "fishing expedition" by plaintiffs in connection with obtaining the first sequestration

---

17. The problem created by the Delaware version of § 8–317 does not exist in New York or California where the version of § 8–317 proposed by the Draftsmen of the Uniform Commercial Code has been adopted.

order and was condemned in Cantor v. Sachs, 18 Del.Ch. 359, 162 A. 73, 85–86 (1932). It follows, defendants say, that the information which plaintiffs have embodied in the affidavits upon which the outstanding sequestration orders were procured was obtained by abusing the process of the Court, that its use as a basis for the present sequestrations violates the "fruit of the poison tree" doctrine, and that it presents a glaring situation for the application of the unclean hands doctrine.

The sequestration in C.A.No. 4072 had been effected under 10 Del.C. § 366 and Chancery Rule 4(db) which is incorporated in the federal rules by F.R.Civ. P. 4(e). The case of Greene v. Johnston, *supra*, is revealing. It likewise involved a sequestration under the sequestration statute and implementing Chancery rules. There the Court had before it the question whether the Chancellor had properly vacated an order of sequestration which insufficiently described the property to be sequestered and had properly refused to issue an alias order of sequestration. The identity of the property to be seized by the alias writ had been obtained by virtue of interrogatories filed in connection with the first sequestration. The Supreme Court of Delaware affirmed the Chancellor's decision in quashing the original sequestration but reversed the Chancellor in refusing to enter an alias sequestration order. The Court held that the information upon which the alias writ was based had been lawfully obtained. The Court strongly indicated, however, by way of dictum to be sure, that even if the information had been improperly obtained it could nonetheless have been used by the plaintiffs in obtaining the alias writ. 99 A.2d at 630. A somewhat similar question to that at bar, although not an identical one, was before the Court in D'Angelo, Receiver v. Petroleos Mexicanos, 378 F.Supp. 1034 (D.Del., unreported opinion filed June 12, 1974) wherein the sequestration was sustained.

As to the contention that the procedure followed by plaintiffs violated the Fourth Amendment of the Constitution of the United States, it is sufficient to say that this point was considered and rejected in D'Angelo, Receiver v. Petroleos Mexicanos, *supra*. For the reasons stated therein it cannot now be accepted.

Concerning defendants' claim of unclean hands on the part of the plaintiffs, defendants assert that the wrong which plaintiffs perpetrated was an "egregious" one. (Doc. 122, p. 14). They cite Rosenthal v. Circuit Judges, 98 Mich. 208, 57 N.W. 112 (1893) as supporting the contention that plaintiffs should be barred from using the information obtained in the first sequestration proceeding to support later sequestrations. The *Rosenthal* decision is clearly distinguishable. In characterizing the action in connection with the first sequestration as an "egregious wrong" defendants exaggerate what plaintiffs did. This Court held that the affidavit which plaintiffs filed was technically deficient in satisfying the sequestration requirement of the Delaware Chancery rule. On appeal, Judge Gibbons in his dissenting opinion agreed with this Court whereas Judges Adams and Van Dusen held that the plaintiffs had fully met the requirement of specificity demanded by the Delaware law. In view of this division of judicial view the affidavit filed by the plaintiffs can scarcely be considered an "egregious wrong". If the information which was the basis of the affidavit in the present sequestrations had been obtained by plaintiffs by an act of some nefarious kind involving a more serious violation of the law a different question might arise. No such situation presents itself here. The alias sequestration orders in C.A.No. 4072 and the original sequestrations in the two later cases should not be invalidated merely because they were based upon information obtained in the first sequestration proceeding in C.A. No. 4072.

The defendants next argue that the complaint insofar as it purports to allege a cause of action against the defendants Minolta and Inter-Marketing is not a bona fide one. They cite Hughes v. TWA, 40 Del.Ch. 552, 185 A.2d 886, 889 (1962) for the principle that there can be no valid sequestration unless "the complaint, regardless of its merits, is on its face a bona fide one." Plaintiffs reply by saying that this argument constitutes an attack on the merits of the complaint and by making it defendants have appeared generally and subjected themselves to the in personam jurisdiction of the Court.

Viewing defendants' position as a challenge under a special appearance to the bona fides of plaintiffs claims against Minolta and Inter-Marketing, nothing in the record evenly remotely supports this charge. Whether the complaint states a claim against Minolta and Inter-Marketing upon which relief can be granted is not before the Court. Even if it does not, however, it does not follow that plaintiffs acted in bad faith when they joined Minolta and Inter-Marketing as defendants.

 Finally, in their briefs the defendants have argued that the seizure of their property violated the United States Constitution. At the argument defendants stated that if the sequestration of the 50 shares of Itel stock should be upheld without regard for constitutional considerations, and "[i]f we got down to fifty shares of Itel stock" defendants would not press the constitutional point. (Doc. 138, p. 27). For this reason the constitutional issue will not be resolved.

In conclusion the sequestration is to be vacated as to all of the property purportedly seized with the exception of the 50 shares of Itel stock owned by Inter-Marketing. The order entered pursuant to this opinion shall provide that the vacation of the sequestration shall be stayed for a period of five days to enable the plaintiffs to initiate an appeal or other proceedings to have the order reviewed.