Clarence KENNEY et ux., Appellants,

v.

John PORTER et ux., and Valley Plumbing Supply Company, Appellees.

No. 1562.

Court of Civil Appeals of Texas, Corpus Christi.

July 2, 1980.

Rehearing Denied Aug. 29, 1980.

James H. Denison, Jr., Adams, Graham, Jenkins, Graham & Hamby, Harlingen, for appellants.

Neil E. Norquest, O. C. Hamilton, Jr., Ewers, Toothaker, Ewers, Abbott, Talbot, Hamilton & Jarvis, McAllen, for appellees.

## OPINION

YOUNG, Justice.

This appeal of a take nothing judgment involves the application of a buy–sell agreement as it relates to the sale of stock of a closely-held corporation. Clarence Kenney and wife, Nelldean, as dissatisfied stockholders of Valley Plumbing Company sought, among other things, specific performance of an unsigned contract of sale of corporate stock against John Porter and wife, Dorothy. The plaintiffs alleged that they were entitled to relief under the terms of the "Agreement of Purchase and Sale" previously executed by the parties.

The defendants contended primarily that the contract of sale sought to be enforced involved stock which is a security controlled by the statute of frauds set out in Tex.Bus. & Comm. Code Ann. § 8.319 (1968); that because the contract was not signed by the parties the Porters could not be forced to purchase the stock. Trial was to a jury. Based upon the jury's verdict, the trial court rendered judgment in favor of the defendants. The Kenneys appeal. We affirm.

A summary of the background facts reflects the following. Valley Plumbing Supply Company is a closely–held corporation which operates a wholesale plumbing supply business. Mr. Porter, appellee, was one of the original incorporators of the company and its principal stockholder. Mr. Kenney, the appellant, began working for the company in 1960 and acquired stock in the company in 1964. Mr. Porter and Mr. Kenney, for the most part, jointly ran the business.

On April 16, 1971, Mr. Porter, Mr. Kenney, and their wives executed an "Agreement of Purchase and Sale" which provided for a mutual buy out or sell out in the event that either party died or became dissatisfied with the Company. Under the agreement, a dissatisfied party could offer his stock at a fixed price to the other party. The offeree would have sixty days in which to purchase the stock. If the offeree chose not to purchase, then he would be obligated to sell his stock to the dissatisfied partner at the same fixed price.

There were no problems in the management of the Company until June 29, 1976, at a special shareholders' meeting in which Porter announced his intention to retire on July 1, 1976. Another individual was elected to operate the Company along with Kenney, both sharing equal control over management. Apparently, Kenney thought that he would take over sole management of the Company after the retirement of Porter. When the board of directors and stockholders (which Porter controlled through his majority ownership of stock) elected another person to operate the Company along with Kenney, Kenney then voiced his dissatisfaction with the operation of the Company and submitted an offer to sell his stock in a letter dated July 7, 1976, pursuant to the provisions of the previously executed Agreement of Purchase and Sale. Porter received the offer on July 9, 1976.

So, under the terms of that agreement, Porter had sixty days in which to purchase the stock offered by Kenney. If he did not elect to purchase at the end of sixty days, Porter had to sell his stock to Kenney at the price mentioned by Kenney. One of the questions presented at the trial court in

defendants' counter–claim was whether the performance of this buy–sell agreement was obligatory in nature. The trial court held that the agreement was obligatory and that the dissatisfied party was required to buy offeree's stock if the offeree did not purchase the offeror's stock.

The record supports the conclusion that Porter and his attorney consulted frequently during August and September of 1976 concerning the possible purchase of the stock. Porter's attorney advised his client that a purchase of the stock by Porter individually would not be to his advantage from a tax standpoint. Therefore, the attorney drew up a proposed agreement for the purchase of the stock by the Company, which included a provision whereby Porter would purchase any stock not bought by the Company.

Negotiations continued between the attorneys for Porter and Kenney on the proposed contract of sale. But, the contract was never signed by the parties. The time for performance under the Agreement of Purchase and Sale expired on September 9, 1976. On September 14, 1976, the attorney for Porter telephoned the attorney for Kenney notifying him that neither the corporation nor Porter intended to purchase the stock.

Appellants originally brought suit for specific performance and damages. Appellees filed a counterclaim seeking reformation of the buy–sell agreement due to mutual mistake of the parties and seeking a declaratory judgment on the status of said Agreement. At the first trial of this cause of action, the trial court granted a summary judgment in favor of the appellees. This Court reversed that judgment and remanded the cause for a trial on the merits. *Kenney v. Porter*, 557 S.W.2d 589 (Tex.Civ. App.–Corpus Christi 1977, no writ).

The case after remand went to trial and was submitted to a jury on special issues. The trial court, after receiving motions for judgment from both sides, ordered that appellants take nothing. About the counterclaim by appellees, the trial court reformed the agreement to make the buy–sell provi-

sions obligatory in nature. The court made no decision about the remainder of the declaratory judgment sought by the appellees because no justiciable controversy existed between the parties concerning the subject matter (termination of the agreement) of the requested declaratory judgment.

The appellants have brought forward twenty–two points of error. These points of error have been grouped by us for discussion in this opinion as follows: points 1 through 12 (investment securities and statute of frauds); points 13 through 15 (promissory estoppel); points 16 through 18 (specific performance); and points 19 through 22 (mutual mistake).

The threshold question in this case is whether stock of a closely–held corporation qualifies as a security and therefore is subject to the provisions of the Texas Business and Commerce Code. It is useful to examine the draftsmen's interpretation of the definitional provisions of the Code and the manner in which other jurisdictions have determined what is a security.

Investment securities are subject to the provisions of Chapter 8 of the Texas Business and Commerce Code. Bus. & Comm. Code Ann. § 8.101 et seq. (1968). The Code sets out the definition of securities as follows:

"Section 8.102. Definitions and Index of Definitions

(a) In this chapter unless the context otherwise requires

(1) A 'security' is an instrument which

(A) is issued in bearer or registered form; and

(B) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(C) is either one of a class or series or by its terms is divisible into a class or series of instruments; and

(D) evidences a share, participation or other interest in property or in an enterprise. or evidences an obligation of the issuer.

(2) A writing which is a security is governed by this chapter and not by Uniform Commercial Code–Commercial Paper even though it also meets the requirements of that chapter. This chapter does not apply to money.

(3) A security is in 'registered form' when it specifies a person entitled to the security or to the rights it evidences and when its transfer may be registered upon books maintained for that purpose by or on behalf of an issuer or the security so states.

(4) A security is in 'bearer form' when it runs to bearer according to its terms and not by reason of any indorsement."

\*　　\*　　\*　　\*　　\*　　\*

Stock of a corporation must meet these statutory definitions before it is subject to the provisions of Chapter Eight of the Code.

The comments to the Code attempt to more fully explain the parameters of what instruments qualify as a security: "(t)he definition of 'security' is functional rather than formal, and it is believed will cover anything which security markets, including not only the organized exchanges but as well as the 'over–the–counter' markets, are likely to regard as suitable for trading." The comments further define security by suggesting what does not qualify: ". . . the definition does not cover anything . . . which is not either 'of a type commonly dealt in upon securities exchanges or markets;' or 'commonly recognized . . . as a medium for investment.'" Apparently in drafting the provisions of the Code the draftsmen sought a broad definition of "security" so as to include virtually every commonly recognized medium for investment.

Due to the confusion which exists regarding classifying corporate stock as a security, the draftsmen's comments to the 1977 revision of the Code specifically include stock of a closely held corporation as a security: "(i)nterests such as the stock of closely–held corporations, although they are not actually traded upon security exchanges, are intended to be included within the definitions of certificated and uncertificated securities by

the inclusion of interests 'of a type' commonly traded in those markets." The controlling section of the statute is the phrase "of a type," which signifies that the instrument or stock need not be actually traded on a securities exchange or market but rather requires only that the stock be similar to instruments traded upon such markets. It is clear that the intent of the draftsmen was to liberally construe the definition of securtiy in § 8.102 so as to include closely–held corporate stock.

Courts in several states have held that stock in small corporations does meet the definitional requirements of security as defined in § 8.102. The Supreme Court of Kansas held that bank stock is a security. *Mildfelt v. Lair*, 221 Kan. 557, 561 P.2d 805 (1977). The Oklahoma Court of Appeals held that the capital stock of a restaurant was an investment security. *Fox v. Overton*, 15 U.C.C. 483 (Okl.Ct.App. Div. 1, 1974). Many other jurisdictions have consistently recognized corporate stock as a security. *Baker v. Gotz*, 387 F.Supp. 1381 (D.C.Del.1975); *Quinn v. Beverages of W. Va., Inc.*, 224 S.E.2d 894 (W.Va.1976); *Godwin v. Westberry*, 231 Ga. 492, 202 S.E.2d 402 (1973); *Cooper v. Vitraco, Inc.*, 320 F.Supp. 239 (D.C.V.I.1970).

From this review of the draftsmen's comments to § 8.102 and the way in which various jurisdictions have resolved the question of what qualifies as a security for the purposes of Chapter Eight of the Code, we can summarize that the prevailing definition of what is a security requires a liberal interpretation classifying the stock of closely–held corporations commonly recognized as a medium of investment as a security. There is still a need, however, to examine each fact situation in order to determine whether the definitional requirements have been met as set out in § 8.102.

When this case first came before this Court on a review of the granting of a summary judgment for appellee Porter [*Kenney v. Porter*, 557 S.W.2d 589 (Tex.Civ. App.–Corpus Christi 1977, no writ)], we reversed and remanded the cause with instructions to determine whether the stock

in the corporation did meet the statutory definition of security set out in § 8.102.

This cause is now before this Court after a full trial on all the issues relating to the sale of securities. The trial judge correctly submitted special issues to the jury embodying the elements of § 8.102. Issues were submitted inquiring whether the stock was of a type commonly dealt in upon securities exchanges or markets [8.102(a)(1)(B)], of a type commonly recognized in the area as a medium of investment [8.102(a)(1)(B)], and one of a class of instruments [8.102(a)(1)(C)]. All of these issues were answered by the jury in the affirmative. After reviewing all the evidence, we find that the answers to those issues have ample support in the evidence.

The other two requirements to satisfy the definition of a security, i. e., an instrument issued in bearer or registered form [8.102(a)(1)(A)] and evidences a share, participation or other interest in property or in an enterprise [8.102(a)(1)(D)], were established as a matter of law. The stock certificates were introduced into evidence at the trial, at which point it was established that they were issued in bearer form. It was uncontroverted that the shares of stock evidenced a share of ownership in Valley Plumbing Supply Company.

Therefore, all questions whether the stock of the corporation was a security under Chapter 8 were resolved by the trial court's determination that the stock of the Company was a security.

Since the stock of the corporation in the case before us is a security, the provisions of Chapter 8 of the Texas Bus. & Comm. Code will control any transactions involving the sale of that stock. Chapter 8 contains a statute of frauds (§ 8.319) which states in part:

"8.319. Statute of Frauds

A contract for the sale of securities is not enforceable by way of action or defense unless

(1) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

\*　　\*　　\*　　\*　　\*　　\*

(4) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price."

Consequently, unless there was a writing signed by Porter or unless he made the admission required by 8.319(4), the proposed contract for the sale of securities is unenforceable.

As we have mentioned, on April 16, 1971, the parties executed an "Agreement of Purchase and Sale." This agreement, signed by all the parties, set out the procedure for reciprocal buy–sell options of stock in case of death or dissatisfaction between the parties. On July 7, 1976, Kenney sent a letter to Porter expressing his desire to sell his stock, or in the alternative, to buy Porter's interest in the business.

There is some evidence that negotiations occurred relating to a possible buy–out by the company. A draft agreement providing for a purchase of the stock of Kenney was prepared by the attorney for Porter. But this agreement was not executed during the sixty day period provided for in the original agreement of purchase and sale. In fact, the proposed agreement was never signed by Porter or his agent even though the draft was prepared by his attorney. Furthermore, the draft instrument provided for a purchase by the Company, not Porter. Since the agreement was never signed by Porter, the contract cannot be enforced under the first exception to § 8.319.

The fourth exception to the statute of frauds (8.319), which is applicable to this case, requires an admission in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price. We have thoroughly reviewed the pleadings, the statement of facts, and other parts of the record before

us and can find no such admission by the appellee. See Parker, "The Evidential Scope of the Admission Exception to U.C.C. Statute of Frauds: Proving an Unwritten Contract under Sections 2.201(3)(b) and 8.319(d)," 56 Texas L.Rev. 915 (1978). Appellants' points 1 through 12 are overruled.

An interesting contention is raised by the appellants in their points 13, 14 and 15 wherein they assert that the appellees are estopped from asserting the statute of frauds. The argument is made that Kenney ceased his attempts to obtain financing to purchase the stock once he was informed by Porter and his attorney that a possible buy–out was being discussed. Kenney allegedly did not obtain financing because of his reliance on the representation made by Porter's attorney that an agreement of purchase was being prepared.

■ This doctrine of "promissory estoppel" is available to those who have relied upon oral promises to furnish written contracts complying with the statute of frauds. *John H. Pelt Co., Inc. v. American Cas. Co. of Reading, Pa.,* 513 S.W.2d 128 (Tex.Civ. App.–Dallas 1974, writ ref'd n.r.e.). The doctrine is based on the principles of equity as shown by § 90 of Restatement of Contracts:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

In most instances involving promissory estoppel, the parties have failed to complete a written contract which sets out their agreement. It is in those situations that this doctrine supplies ". . . a remedy which will enable the injured party to be compensated for his reasonable, definite and substantial reliance." *Wheeler v. White,* 398 S.W.2d 93, 97 (Tex.Sup.1965). There is no clearer statement of the essential purpose of promissory estoppel than that found in *Wheeler v. White,* supra, at page 96:

"The binding thread which runs through the cases applying promissory estoppel is

the existence of promises designedly made to influence the conduct of the promisee, tacitly encouraging the conduct, which conduct, although not necessarily constituting any actual performance of the contract itself, is something that must be done by the promisee before he could begin to perform, and was a fact know to the promisor."

The key to this doctrine is the existence of a promise which estops the promisor from denying its enforceability. *Briercroft S. & L. Ass'n v. Foster Financial, Corp.,* 533 S.W.2d 898 (Tex.Civ.App.–Eastland 1976, writ ref'd n.r.e.).

■ Promissory estoppel has been recognized by this Court in situations in which the statute of frauds has prevented the introduction of unsigned instruments into evidence. The principle behind such application is that the promise should be enforced as if it had been signed in order to avoid an unjust result. *Retama Manor Nursing, Etc. v. Cole,* 582 S.W.2d 196 (Tex. Civ.App.–Corpus Christi 1979, writ ref'd n.r. e.). Even though the doctrine is normally considered to be a defensive plea, it may be used by a plaintiff as a ground of entitlement to relief. *Southwest Water Services, Inc. v. Cope,* 531 S.W.2d 873 (Tex.Civ.App.– Fort Worth 1975, writ ref'd n.r.e.).

■■ The increasing use of promissory estoppel in situations involving the unenforceability of a promise because of the statute of frauds has necessitated a clarification of the elements required to permit the use of this doctrine. Not only must a party comply with the elements of the doctrine itself, i. e., reasonable expectation of a promise that should and actually does cause action or forbearance of a definite and substantial character, but the party must also prove that (1) the promisor misrepresented that the statute of frauds' requirements had been complied with, or (2) a promise to make a memorandum or contract has been made. *"Moore" Burger, Inc. v. Phillips Petroleum Company,* 492 S.W.2d 934 (Tex.Sup. 1972); *John H. Pelt Co., Inc., v. American Cas. Co. of Reading, Pa.,* supra; 73 Am. Jur.2d Statute of Frauds, § 567. About the

second of those requirements that of evidence that a promise has been made to put the agreement in a form that would comply with the statute of frauds, there must also be reliance upon that promise to put the agreement into written form. *Dickinson v. Auto Ctr. Mfg. Co.*, 594 F.2d 523, 528 (5th Cir.1979).

This second requirement has applicability to the case at bar. The appellant must prove every element of promissory estoppel and additionally, reliance upon a promise to put the agreement into written form that would comply with the statute of frauds. See *Rio Delta Land Company v. Johnson*, 475 S.W.2d 346 (Tex.Civ.App.–Corpus Christi 1971, writ ref'd n.r.e.). Special issues were submitted to the jury in that regard.

"SPECIAL ISSUE NO. 1

Did Jim Abbott notify Ray Jenkins that Mr. Porter has agreed to purchase Mr. Kenney's stock under the terms in Stipulation Exhibit H?

Answer 'Yes' or 'No'.

We, the Jury, answer __Yes__

If you have answered Special Issue No. 1 'Yes', then answer Special Issue No. 2; otherwise, do not answer Issues 2, 3, 4 and 5 and skip to Special Issue No. 6.

SPECIAL ISSUE NO. 2

Did Mr. Porter authorize Jim Abbott to notify Ray Jenkins that Mr. Porter agreed to purchase Mr. Kenney's stock under the terms in Stipulation Exhibit H?

Answer 'Yes' or 'No'.

We, the Jury, answer __Yes__

If you have answered Special Issue No. 2 'Yes', then answer Special Issue No. 3; otherwise, do not answer Special No. 3 and skip to Special No. 4.

SPECIAL ISSUE NO. 3

Find from a preponderance of the evidence the date Jim Abbott notified Ray Jenkins that Mr. Porter had so agreed to purchase Mr. Kenney's stock under the terms in Stipulation Exhibit H?

Answer by day, month and year.

We, the Jury, answer __Sept. 13, 1976__ "

It appears from a cursory examination of these issues that that doctrine of promissory estoppel should apply to negate the appellees' contention that the contract is unenforceable because of non-compliance with the statute of frauds. But before we make that decision, we must examine the time period during which Kenney attempted to invoke the reciprocal buy–sell provisions. In the original letter sent by Kenney on July 7, 1976, to Porter exercising the option provided for in the Agreement of Purchase and Sale, Porter had sixty days from the date of receipt of the letter in which to buy Kenney's stock. At no time during that period did Porter promise to prepare a contract for the purchase of the stock. The jury found that the appellees' attorney (with apparent authority to do so) did communicate Porter's agreement to a purchase of the stock by the company, but that promise was not made until September 13, 1976, some four days after the sixty day option period had expired. After the sixty days had expired, it was Kenney's duty to procure financing for the purchase of Porter's stock.

■ It is the contention of Kenney that the promise to buy out his stock by the corporation induced him to cease looking for financing. The jury found, however, that such promise was not made until after the expiration of the sixty day period. Therefore, there was no act of forbearance caused by the attorney's communicating his client's (Porter's) agreement to purchase. Without this essential inducement of forbearance, the plea of promissory estoppel cannot be invoked by the appellants to remove the agreement from the statute of frauds.

■ Additionally, appellants cannot rely on the doctrine of promissory estoppel in that they have failed to prove that the appellees orally promised to prepare a written document that would meet the requirements of the statute of frauds. The jury resolved this issue in Special Issue No. 9:

"SPECIAL ISSUE NO. 9

Did Jim Abbott tell Ray Jenkins that Mr. Porter would sign Stipulation Exhibit H?

Answer 'Yes' or 'No'.

We, the Jury, answer ___No___

If you have answered Special Issue No. 9 'Yes', then answer Special Issue No. 10, otherwise, do not answer No. 10 nor No. 11 and skip to Special Issue No. 12."

The agreement would have to be signed to comply with the statute of frauds. The jury specifically found that no representation was made by Porter's attorney that Porter would sign the agreement. Such an agreement, even though substantially complete and embodying the intent of the parties, would not be enforceable under the statute of frauds without the signature of Porter. Therefore, the appellants did not meet this additional element of a promise to make a written memorandum that would comply with the statute of frauds. *"Moore" Burger, Inc. v. Phillips Petroleum Company,* supra; *John H. Pelt Co., Inc. v. American Cas. Co. of Reading, Pa.,* supra at 131. Appellants' points 13, 14 and 15 are overruled.

If this Court agreed with the arguments advanced by appellants denying the applicability of the statute of frauds and recognizing promissory estoppel, then the remedy of specific performance of the contract sought by the appellants in the trial court would have been appropriate. But specific performance of the contract is not available to the appellants in light of our holdings herein. Points 16, 17 and 18 are overruled.

In their final four points of error (19, 20, 21 and 22), appellants challenge the trial court's finding that a mutual mistake was made in the wording setting out in the buy–sell option (i. e., Agreement of Purchase and Sale). In that agreement the pertinent language is as follows:

"If the offeree fails to accept said offer within said sixty (60) day period of time, the dissatisfied partner shall *have the*

*right to* purchase the stock of the offeree for cash at the value so fixed . . ." (Emphasis supplied).

The trial court, based on testimony from both Kenney and Porter, found that the above language was in error and that a mutual mistake had been made. He therefore reformed the agreement to read as follows:

"If the offeree fails to accept said offer within said sixty (60) day period of time, the dissatisfied partner *shall purchase* the stock from the offeree . . ." (Emphasis supplied).

This reformation imposes an obligation on a dissatisfied partner to purchase the stock át the price he originally offered to the offeree upon the expiration of sixty days if the offeree fails to accept said original offer.

No issue was submitted to the jury on the question of mutual mistake. The trial court found that there was a mutual mistake as a matter of law. The intent of the parties to create a binding obligation on a dissatisfied partner was uncontroverted. Both Kenney and Porter testified that such was their original understanding of the agreement when it was executed.

The agreement was also signed by the wives of both Kenney and Porter. Mrs. Porter and Mrs. Kenney, as signatories of the agreement, understood the buy–sell provision of that agreement to be mandatory in nature. Both women testified that the agreement created an obligation to purchase if the offeree refused to accept the offer of the dissatisfied party.

Additionally, the appellants contend that the appellees are barred by the statute of limitations from asserting mutual mistake of the parties as to the wording of the original agreement. Tex.Rev.Civ.Stat.Ann. § 5529 (1925) is as follows:

"Art. 5529. All other actions barred, when

Every action other than for the recovery of real estate, for which no limitation is otherwise prescribed, shall be brought within four years next after the right to bring the same shall have accrued and not afterward."

**306**

The issue of mutual mistake of fact and the prayer for reformation of the agreement was raised in a counterclaim by the appellees. Appellants raised the statute of limitations as to reformation of the agreement as an affirmative defense. T.R.C.P., Rule 94.

It is commonly accepted that a statute of limitations begins to run from the time of execution of the instrument. *Chisholm v. Hipes,* 552 S.W.2d 519 (Tex.Civ. App.–Amarillo 1977, no writ); *La Neve v. Hinkson,* 271 S.W.2d 467 (Tex.Civ.App.– Eastland 1954, writ ref'd n.r.e.). But a mutual mistake of the parties about the language contained in an instrument causes a tolling of the statute until such time as is necessary to discover such mistake, or, in the exercise of reasonable diligence, the time that should have been necessary to discover the mistake. *McClung v. Lawrence,* 430 S.W.2d 179 (Tex.Sup.1968); *Miles v. Martin,* 321 S.W.2d 62 (Tex.Sup.1959). The mistake must be recognizable as equitably sufficient to toll the statute. *Gage v. Owen,* 435 S.W.2d 559 (Tex.Civ.App.–Fort Worth 1968, writ ref'd n.r.e.). A clear statement of this proposition is found in *Weaver v. First National Bk. of Amarillo,* 532 S.W.2d 416 (Tex.Civ.App.–Waco 1976, no writ):

> ". . . where the parties to an instrument are in clear agreement as to the factual and legal result they wish to accomplish by it, but, by mutual mistake, the legal effect of the words they use does not produce that result, the case is a proper one for reformation of the instrument to make it conform to the antecedent intention of the parties; . . ."

The evidence is uncontroverted that all parties to the Agreement of Purchase and Sale intended and understood the buy–sell option to be obligatory in nature. The parties did not realize, nor should they have realized, that the wording of this provision would be subject to two interpretations. The trial court, recognizing this mutual mistake, and correctly reformed the agreement to reflect the intent of the parties in case a dispute arises in the future. Appellants' points 19, 20, 21 and 22 and all cross–points of the appellees are overruled.

The judgment of the trial court is affirmed.